UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------------------------

DONALD J. SILMON and MARY SILMON,
Derivatively; and JEFFREY E. CAMPBELL, II
and ANNETTE PARKER, Derivatively,

                     Plaintiffs,

     -vs-


CITY OF BUFFALO, NEW YORK
CITY OF BUFFALO POLICE DEPARTMENT,
GREGORY KWIATKOWSKI, JOSEPH WENDEL,
RAYMOND KRUG and "POLICE OFFICER DOES",

                     Defendants.

------------------------------------------------------


                     Examination Before Trial of

GREGORY KWIATKOWSKI, Defendant, taken pursuant to the

Federal Rules of Civil Procedure, in the law offices of

ROLAND M. CERCONE, 484 Delaware Avenue, Buffalo, New York,

taken on July 6, 2011, commencing at 10:00 A.M., before

CARLA M. GLINSKI, Notary Public.


### Sue Ann Simonin Court Reporting

421 Franklin Street
Buffalo, New York 14202



(716) 882-8059
Fax (716) 882-8099
sascr.com

2

1    APPEARANCES:

2    ROLAND M. CERCONE, ESQ.,
     484 Delaware Avenue,
3    Buffalo, New York 14202,
     Appearing for the Plaintiffs.
4
     CITY OF BUFFALO DEPARTMENT OF LAW,
5    By CARMEN J. GENTILE, ESQ.,
     Assistant Corporation Counsel,
6    1126 City Hall,
     Buffalo, New York 14202,
7    Appearing for the Defendants.

8
     PRESENT:  Mary Silmon
9              Donald J. Silmon
               Jeffrey E. Campbell, II
10             Annette Parker

11

12       (The following stipulations were entered

13   into by both parties.)

14       It is hereby stipulated by and between counsel

15   for the respective parties that the oath of the

16   Referee is waived, that signing, filing and

17   certification of the transcript are waived, and

18   that all objections, except as to the form of the

19   questions, are reserved until the time of trial.

20

21       G R E G O R Y   K W I A T K O W S K I,

22       E District, 2767 Bailey Avenue,

23          Buffalo, New York,

3

1              after being duly called and sworn,

2                 testified as follows:

3

4   MR. CERCONE:  Just for the record, Carmen, you and I

5        had a discussion off the record.  Mr. Kwiatkowski

6        doesn't want to give us a personal address and I

7        said that's fine as long as he puts on the record

8        that he's giving you authority to accept all

9        personal service on his behalf.

10              Is that true, sir?

11  THE WITNESS:  Yes.

12  MR. GENTILE:  We just went through it.

13  MR. CERCONE:  Just so it's not messed up, sir, do you

14       agree to put on the record that you're

15       authorizing your attorney, Carmen Gentile, to

16       accept all personal service on your behalf?

17  THE WITNESS:  Yes.

18  MR. CERCONE:  This way you don't have to give your

19       personal home address.  I understand that.

20  THE WITNESS:  Yes.

21  MR. GENTILE:  Authorizing the Corporation Counsel of

22       the City of Buffalo to accept service.  I could

23       drop dead tomorrow.

4

1    MR. CERCONE:   Hopefully not, Carmen.   That's fine.

2

3    EXAMINATION BY MR. CERCONE:

4

5    Q.   Sir, what is your date of birth for the record,

6         please?

7    A.   August 11th, 1964.

8    Q.   And how are you currently employed?

9    A.   I'm a retired lieutenant from the Buffalo Police

10        Department.

11   Q.   By the way, sir, we just met and were introduced

12        again briefly, but you understand that I

13        represent Mr. Silmon, Mr. Parker (sic) and the

14        parties present here today pertaining to

15        incidents that allegedly occurred in the early

16        morning hours of May 31st, 2009?   Do you

17        understand that, sir?

18   A.   Yes.

19   Q.   And I'm going to be asking you questions

20        regarding your knowledge and involvement in those

21        incidents.   Do you understand that, sir?

22   A.   Yes.

23   Q.   And if at any time, sir, you don't hear me in the

1       least bit or you're confused as to any question I

2       ask you, would you please tell me so and I'll be

3       glad to reask or rephrase it.

4   A.  Sure.

5   Q.  You understand that I do not want you to answer

6       any questions unless you completely hear it and

7       completely understand it?

8   A.  Yes.

9   Q.  Sir, you're not doing any other work at the

10      present time since you retired from the Buffalo

11      Police Department?

12  A.  Correct.

13  Q.  When did you retire from the Buffalo Police

14      Department?

15  A.  January 26th, 2011.

16  Q.  Why did you retire on January 26th, 2011?

17  A.  I had twenty-one years on plus my military time,

18      so I had twenty-four years on eligible for the

19      retirement and I took it.

20  Q.  Were you under investigation for an incident

21      where you choked a fellow police officer at the

22      station?

23  A.  No.

1   MR. GENTILE:  Can I respond?

2   MR. CERCONE:  Yes.

3   MR. GENTILE:  I'm going to ask the witness not to

4       respond because this relates to matters which are

5       subject to confidentiality pursuant to New York

6       State Civil Rights Law Section 50 dash small A.

7       If there's any questions regarding internal

8       investigations by the Buffalo Police Department,

9       I would ask the witness not to respond.  Counsel

10      certainly can move the Court if he deems

11      necessary.

12  BY MR. CERCONE:

13  Q.  Well, sir, were you accused -- and I'm not

14      talking about by your department, but were you

15      accused of choking or assaulting another police

16      officer just prior to you retiring?

17  MR. GENTILE:  Are you referring to a criminal charge?

18  MR. CERCONE:  No.

19  MR. GENTILE:  An internal investigation?

20  MR. CERCONE:  Prior bad acts.  I'm allowed to ask

21      about prior moral bad acts.  I didn't ask about

22      the investigation of the Buffalo Police

23      Department.  I'm allowed to ask about prior bad

1   immoral acts.

2   THE WITNESS:  No.  I say no.

3   MR. GENTILE:  I'll let him answer.

4   BY MR. CERCONE:

5   Q.  What occurred at the precinct station where there

6       was allegations in the newspaper that you

7       allegedly choked another police officer?

8   MR. GENTILE:  When was that?

9   MR. CERCONE:  Shortly before his retirement.  I'm

10      sure he knows what I'm talking about.

11  THE WITNESS:  When was it?

12  BY MR. CERCONE:

13  Q.  You don't know the incident I'm talking about?

14  MR. GENTILE:  Could you give him a date.

15  THE WITNESS:  Plus, what you're referring to didn't

16      happen, so I don't -- like you're saying choke.

17      I don't know what you're talking --

18  BY MR. CERCONE:

19  Q.  Well, are you familiar with an article in the

20      Buffalo newspaper that alleged that you choked

21      and assaulted a fellow police officer?

22  MR. GENTILE:  I'm going to object to the form of the

23      question.

1  MR. CERCONE:  Okay.

2  MR. GENTILE:  The witness can try to answer that.

3  THE WITNESS:  Yes, I'm aware of the newspaper article

4      referring to that.

5  BY MR. CERCONE:

6  Q.  Okay.  Do you remember the time frame in which

7      they were talking about in that article as to

8      when the alleged incident occurred?

9  A.  The time frame?

10  Q.  Roughly.

11  A.  Roughly, it was around the time when the article

12      came out, I guess.

13  Q.  How soon after that article came out did you

14      retire?

15  A.  I'm going to say eight or nine months.

16  Q.  Okay.  So then in the eight or nine months prior

17      to retiring, there was an allegation in The

18      Buffalo News that you allegedly choked or

19      assaulted -- and I'm not sure exactly how they

20      phrased it at this time -- a fellow police

21      officer, correct?

22  MR. GENTILE:  Object to the form.  You can answer it.

23  THE WITNESS:  I don't understand what you're asking

1    me.  What did you ask me?

2  BY MR. CERCONE:

3  Q.  That's what the allegations were in the Buffalo

4      newspaper?

5  MR. GENTILE:  Form.

6  THE WITNESS:  Originally, yes.

7  BY MR. CERCONE:

8  Q.  Okay.  And with whom was this -- who was the

9      other officer involved?

10 A.  There wasn't a name in the newspaper.

11 Q.  I know there wasn't a name in the newspaper.  Who

12     was the other officer they were referring to?

13 A.  James McAndrew.

14 Q.  And did the newspaper article allege that you

15     assaulted him because he asked for a transfer out

16     of your -- out from your supervision?

17 MR. GENTILE:  Form.

18 THE WITNESS:  Yes.

19 BY MR. CERCONE:

20 Q.  Did you ever have a discussion with Officer

21     McAndrew about that?

22 MR. GENTILE:  Form.

23 THE WITNESS:  No.

1  BY MR. CERCONE:

2  Q.  Did you ever have any discussion whatsoever as to

3     why he was requesting a transfer from you?

4  MR. GENTILE:  Form.

5  THE WITNESS:  He didn't request a transfer.

6  BY MR. CERCONE:

7  Q.  Did you ever have a discussion with him as to

8     what problem he may have had with you around that

9     time?

10  MR. GENTILE:  Form.

11  BY MR. CERCONE:

12  Q.  Eight or nine months before you retired.

13  MR. GENTILE:  Form.

14  THE WITNESS:  I don't understand your question.  Did

15     I have what?

16  BY MR. CERCONE:

17  Q.  A discussion with him at all in any way, shape or

18     form as to why he did not want to be under your

19     supervision.

20  MR. GENTILE:  Form.

21  THE WITNESS:  I just told you he never asked for a

22     transfer out of my supervision.

23  BY MR. CERCONE:

1   Q.   So you never had a problem with Officer McAndrew
2        at all?
3   A.   Other than normal disciplinary procedures as his
4        supervisor, no.
5   Q.   What do you mean normal disciplinary procedures?
6   A.   When he was a young officer, when I would see
7        things that would need to be corrected or he
8        needs being advised on, I would advise him on it.
9   Q.   Without telling me any of the content of what
10       happened, was there an investigation by the
11       Buffalo Police Department into this alleged
12       incident?
13  A.   Yes.
14  Q.   Did you ever testify before the internal affairs
15       committee on this incident?
16  MR. GENTILE:  Object to -- I request he not answer
17       the question.
18  MR. CERCONE:  If he testified.  I'm not asking for
19       any content.
20  MR. GENTILE:  It involves the procedure of the
21       investigation as to whether and who was called to
22       testify for any investigations.
23  MR. CERCONE:  I want to know if he testified, that's

1       all.

2    MR. GENTILE:   He's not going to answer it because it

3       relates to an internal investigation.

4    BY MR. CERCONE:

5    Q.   No.   Was that investigation concluded prior to

6       you retiring?

7    A.   I have no idea.

8    Q.   So as you sit here today under oath, are you

9       saying that you never physically touched Officer

10      McAndrew in any way, shape or form as it pertains

11      to those allegations that occurred approximately

12      eight to nine months before your retirement?

13   MR. GENTILE:   Object to the form.

14   THE WITNESS:   No.

15   BY MR. CERCONE:

16   Q.   Are you saying that, no, did not occur or, no,

17      you did not touch him?

18   A.   What did you ask me?

19   Q.   I'm asking if you ever touched him in any way,

20      shape or form.

21   A.   Yes, I did.

22   Q.   And in what manner did you do that that comprises

23      these alleged eight to nine months prior to your

1    retirement?

2    MR. GENTILE:  Object to form.  You can try to answer.

3    THE WITNESS:  He was getting up out of his seat and I

4       grabbed him by his vest and sat him back down.

5    BY MR. CERCONE:

6    Q.  And why did you do that?

7    MR. GENTILE:  Form.

8    THE WITNESS:  'Cause he was getting up at me in a

9       hostile manner and I sat him back down.

10   BY MR. CERCONE:

11   Q.  Why was he getting up at you in a hostile manner?

12   MR. GENTILE:  Form.

13   THE WITNESS:  I have no idea.  You'd have to ask him.

14   BY MR. CERCONE:

15   Q.  Well, did you say something to him prior to him

16      getting up allegedly in this fashion as you

17      claim?

18   MR. GENTILE:  Form.

19   THE WITNESS:  I had asked him a question in regards

20      to the platoon.

21   BY MR. CERCONE:

22   Q.  What did you ask him regarding the platoon?

23   A.  If he had been stating -- if he had been talking

1      to people about the platoon in a bad light.

2   MR. GENTILE:  Object to form of the last question.

3   BY MR. CERCONE:

4   Q.  So it's your claim that you simply asked him a

5      question, had you been talking about the platoon

6      in a bad light, and he got up at you in a hostile

7      manner?

8   MR. GENTILE:  Object to form.

9   THE WITNESS:  Correct.

10  BY MR. CERCONE:

11  Q.  That was it, you asked that simple question and

12      he got hostile against you?

13  MR. GENTILE:  Object to the form.

14  BY MR. CERCONE:

15  Q.  Is that your testimony?

16  MR. GENTILE:  Object to the form.

17  THE WITNESS:  Yes.  That's pretty much the gist of

18      the whole conversation.

19  BY MR. CERCONE:

20  Q.  Well, I mean, if there's more to it, I'm entitled

21      to know it as you're under oath.

22  MR. GENTILE:  Object to the form.

23  THE WITNESS:  And under oath that's pretty much all I

1       remember is, it was a conversation, him talking

2       to people out of the -- outside the platoon about

3       our platoon.

4   BY MR. CERCONE:

5   Q.   What platoon are you talking about?

6   MR. GENTILE:   Object to the form.

7   THE WITNESS:   My platoon.   The one we worked on.

8   BY MR. CERCONE:

9   Q.   What was the work platoon?

10  MR. GENTILE:   Object to the form.

11  THE WITNESS:   What was it?

12  BY MR. CERCONE:

13  Q.   Was it a special platoon?   Just regular daily

14      shift?

15  A.   Yeah, the shift.

16  MR. GENTILE:   Object to the form.

17  BY MR. CERCONE:

18  Q.   And who was in this platoon?

19  MR. GENTILE:   Object to form.

20  THE WITNESS:   Approximately twelve to fourteen

21      people.

22  BY MR. CERCONE:

23  Q.   Was Officer Wendel in it?

1    MR. GENTILE:  Object to the form.

2    THE WITNESS:  Yes.

3    BY MR. CERCONE:

4    Q.  Was Officer Krug in it?

5    A.  Yes.

6    MR. GENTILE:  Form.

7    BY MR. CERCONE:

8    Q.  And what was your understanding that Officer

9        McAndrew was allegedly saying that you felt might

10       have been disparaging to your platoon?

11   MR. GENTILE:  Form.

12   THE WITNESS:  I don't recall.  I know that he had

13       said something to someone else that somebody told

14       me.  I can't recall what it was.

15   BY MR. CERCONE:

16   Q.  You have no idea as you sit here at all?

17   A.  No.

18   MR. GENTILE:  Form.

19   BY MR. CERCONE:

20   Q.  Who told you this?

21   MR. GENTILE:  Form.

22   THE WITNESS:  I don't even remember.  It was

23       something that was said -- it was in court.

1   BY MR. CERCONE:

2   Q.   So just so I get this straight, somebody in court

3        tells you something, is that correct?

4   A.   Correct.

5   Q.   You can't remember what it is, is that correct?

6   MR. GENTILE:   Form.

7   THE WITNESS:   Just that I -- like I said, he was

8        saying the platoon -- you know, he's too young to

9        be on the platoon and that he doesn't want to,

10       you know, get in trouble, so he was thinking of

11       transferring to days or something maybe.  I don't

12       know.

13   BY MR. CERCONE:

14   Q.   Why did he say he doesn't want to be in trouble

15       under your platoon?

16   MR. GENTILE:   Form.

17   THE WITNESS:   I have no idea.

18   BY MR. CERCONE:

19   Q.   And so you asked him why he said that and you're

20       saying he then went at you in a hostile manner?

21   A.   Correct.

22   Q.   And you grabbed him by his vest and threw him

23       back in his chair?

1   MR. GENTILE:  Form.

2   THE WITNESS:  Correct.

3   BY MR. CERCONE:

4   Q.  Anything else happen after that?

5   A.  He stood up and was held back by other officers I

6       believe.

7   Q.  What did you say to him as you grabbed him by the

8       vest and threw him back into the chair?

9   MR. GENTILE:  Form.

10  THE WITNESS:  I don't, I don't even recall.

11  BY MR. CERCONE:

12  Q.  What happened after that?

13  A.  Meaning what?

14  Q.  Was there any meeting, discussion, anything like

15      that outside of internal affairs?

16  A.  With who?

17  Q.  Between you and Officer McAndrew or any other

18      parties involved relating to that incident --

19  A.  No.

20  Q.  -- as you just described it.

21  A.  No.

22  Q.  Did you ever have any further words with Officer

23      McAndrew about that?

1  A.  No.

2  MR. GENTILE:  Form.

3  BY MR. CERCONE:

4  Q.  How old was Officer McAndrew at the time?

5  A.  No idea.

6  Q.  Where is Officer McAndrew now, if you know?

7  MR. GENTILE:  Form.

8  THE WITNESS:  I have no idea where he is.

9  BY MR. CERCONE:

10  Q.  When you retired in January of '11, was he still

11      at E Precinct?

12  MR. GENTILE:  Form.

13  THE WITNESS:  Yes.

14  BY MR. CERCONE:

15  Q.  And who was his supervisor then?

16  MR. GENTILE:  Form.

17  THE WITNESS:  I was.

18  BY MR. CERCONE:

19  Q.  After you retired, do you know who became his

20      supervisor?

21  MR. GENTILE:  Form.

22  THE WITNESS:  They assigned someone from the relief

23      circuit there I believe.

1   BY MR. CERCONE:

2   Q.  After you grabbed him, did any of the officers

3       have to grab you?

4   MR. GENTILE:  Form.

5   THE WITNESS:  No.

6   BY MR. CERCONE:

7   Q.  Nobody got in the middle of the two of you?

8   MR. GENTILE:  Form.

9   THE WITNESS:  I told you, other officers grabbed him

10      and restrained him.

11  BY MR. CERCONE:

12  Q.  Who were the officers that grabbed him?

13  MR. GENTILE:  Form.

14  THE WITNESS:  I don't recall.

15  BY MR. CERCONE:

16  Q.  After that incident, were you still working prior

17      to retiring?

18  A.  What do you mean?

19  Q.  Were you still working on the job up until

20      January 2011 in that eight, nine-month period of

21      time?

22  A.  Yeah, I was working.  Yes.

23  Q.  Weren't you suspended?

1   MR. GENTILE:  Form.

2   THE WITNESS:  Yes.

3   BY MR. CERCONE:

4   Q.  So that's not working.

5   A.  I was getting paid.  I didn't retire until

6       January.

7   Q.  I know, but you were suspended?

8   A.  Correct.

9   Q.  Okay.

10  A.  Why don't you just ask me that, if I was

11      suspended.

12  Q.  Because I wanted to hear your testimony.  I asked

13      if you were working on the job, you said you

14      considered being suspended working on the job.

15  A.  I was getting paid.

16  Q.  Do you use suspend --

17  MR. GENTILE:  He answered the question.

18  MR. CERCONE:  No, he didn't.  He said he was getting

19      paid.

20  MR. GENTILE:  Yes, and he said he considers it

21      working while being suspended.

22  BY MR. CERCONE:

23  Q.  Okay.  Do you consider being suspended working on

```
 1      the job?
 2  A.  Yes.
 3  Q.  Were you told that you could not enter the police
 4      building when you were suspended?
 5  MR. GENTILE:  Object to the form.  I'm going to not
 6      have him answer any more questions about his
 7      suspension, okay?
 8  MR. CERCONE:  Carmen, you can't do that.  I'm not
 9      asking about an internal --
10  MR. GENTILE:  It relates to disciplinary proceedings.
11      I'm not going to have him answer any more
12      questions about this incident.
13  BY MR. CERCONE:
14  Q.  Did you ever have any criminal charges brought up
15      against you in federal court or anywhere else?
16  A.  No.
17  Q.  At any point in time, not just regarding this
18      incident.
19  A.  No.
20  Q.  Did you ever take a group of boys that you
21      thought were in a gang and dump them in a rival
22      gang's turf?
23  A.  No.
```

1   Q.   Were you ever accused of that in the newspaper?

2   MR. GENTILE:   Form.

3   THE WITNESS:   No.

4   BY MR. CERCONE:

5   Q.   Were you ever accused of that on the radio?

6   A.   No.

7   MR. GENTILE:   Form.

8   BY MR. CERCONE:

9   Q.   Did you ever put them in some adversarial turf

10      and then go over your radio system that they were

11      snitching?

12  A.   No.

13  MR. GENTILE:   Form.

14  BY MR. CERCONE:

15  Q.   Did any of your officers in your platoon do that?

16  MR. GENTILE:   Form.

17  BY MR. CERCONE:

18  Q.   That you were aware of.

19  A.   No.

20  Q.   Did any such incident allegedly ever come to your

21      attention?

22  MR. GENTILE:   Form.

23  THE WITNESS:   Yes.

1   BY MR. CERCONE:

2   Q.   And where and when was this?

3   A.   The -- Chief Young's office.

4   Q.   Who's Chief Young?

5   A.   Chief of E District.

6   Q.   And what did he say to you at the time?

7   MR. GENTILE:   Object to form.

8   THE WITNESS:   He asked me if I had any knowledge of

9        gang members from Bailey Avenue being taken to

10       Central Park area.  Which I replied no as I just

11       did to you.

12  BY MR. CERCONE:

13  Q.   Well, did you then investigate?

14  MR. GENTILE:   Form.

15  THE WITNESS:   Captain Stabler was investigating it.

16  BY MR. CERCONE:

17  Q.   Do you know if any of the allegations involved

18       either Officer Wendel or Officer Krug?

19  MR. GENTILE:   Form.

20  THE WITNESS:   I don't know who it involved because I

21       don't believe that it transpired.

22  BY MR. CERCONE:

23  Q.   Well, did you do any investigation yourself?

1   MR. GENTILE:  Form.

2   THE WITNESS:  I asked if -- I asked at briefing if

3       anybody had any knowledge of it and everyone said

4       no.

5   BY MR. CERCONE:

6   Q.  Nobody stole any police cars at that time, did

7       they?

8   MR. GENTILE:  Object to the form.

9   THE WITNESS:  When?

10  BY MR. CERCONE:

11  Q.  At the time this alleged incident occurred.

12  MR. GENTILE:  What incident are you talking about?

13  MR. CERCONE:  Where the Bailey Street gang was dumped

14      in a rival gang's turf.

15  MR. GENTILE:  Object to the form.

16  THE WITNESS:  To my knowledge, it didn't happen, so

17      -- I don't know whether it could have happened,

18      but to my knowledge, there were no police cars

19      stolen at any time under my command.

20  BY MR. CERCONE:

21  Q.  What happened with you and a transit cop, Officer

22      Delacey, after the awards banquet dinner?

23  MR. GENTILE:  Form.

1    THE WITNESS:   I asked him what -- 'cause he was

2       yelling and swearing at some officers that were

3       Buffalo police officers that were out on the

4       patio of a restaurant, I asked him why he was

5       doing that.   He informed me he was a transit

6       police officer.   And I asked him what his name

7       was, he told me his name, and that was pretty

8       much my conversation with him.

9    BY MR. CERCONE:

10   Q.   Well, did anyone strike him or punch him in the

11      face?

12   MR. GENTILE:   Form.

13   THE WITNESS:   I didn't see anything like that.

14   BY MR. CERCONE:

15   Q.   Did you hit him at all?

16   A.   No.

17   MR. GENTILE:   Form.

18   BY MR. CERCONE:

19   Q.   Did you ever physically touch him in any manner?

20   MR. GENTILE:   Form.

21   THE WITNESS:   No.

22   BY MR. CERCONE:

23   Q.   Never put your hands on him in any way, shape or

1      form -- third time -- correct?

2   MR. GENTILE:  Form.

3   BY MR. CERCONE:

4   Q.  You're aware of the allegations in the paper that

5        he was punched in the face, correct?

6   MR. GENTILE:  Form.

7   THE WITNESS:  Yes.

8   BY MR. CERCONE:

9   Q.  Okay.  And you have no knowledge of anyone doing

10       that?

11  MR. GENTILE:  Form.

12  THE WITNESS:  I didn't see anyone hit him.

13  BY MR. CERCONE:

14  Q.  Were you with your platoon members at the time

15       this happened?

16  MR. GENTILE:  Form.

17  THE WITNESS:  I was with other officers.  Some on my

18       platoon, some not.

19  BY MR. CERCONE:

20  Q.  Were you with Officer Wendel or Officer Krug?

21  MR. GENTILE:  Form.

22  THE WITNESS:  Officer Wendel.  Not Officer Krug.

23  BY MR. CERCONE:

1   Q.   By the way, is Officer Wendel a personal friend
2        of yours?
3   A.   Yes, he's a friend.
4   Q.   I mean, you hang out and do things outside of
5        work; is that true?
6   A.   When we were working, we all did things together
7        outside of work.  Since I retired, I really
8        haven't seen any of them guys.
9   Q.   So you haven't seen Officer Wendel at all since
10       you retired?
11  A.   Maybe once or twice.  Not in a while.
12  Q.   Okay.  And in the one or two times, what was that
13       for?
14  A.   My retirement party and maybe a benefit.
15  Q.   A benefit for who?
16  A.   I believe it might have been Billy Rieman.
17  Q.   What about Officer Krug, have you seen him since
18       you retired?
19  A.   Maybe the same places.
20  Q.   Prior to this incident with Officer Delacey --
21       and, by the way, where did that occur?
22  A.   Page's.
23  Q.   Page's is a bar?

1  A.   Bar/restaurant, correct.

2  Q.   Were you and other police officers at Salvatore's

3       Restaurant?

4  A.   Yes.

5  Q.   And was there any incident where you or other

6       officers that you're aware of had stolen a case

7       of beer from some gentleman while at Salvatore's?

8  MR. GENTILE:   Object to the form.

9  BY MR. CERCONE:

10 Q.   Were you aware of any allegations to that effect?

11 MR. GENTILE:   Form.

12 THE WITNESS:   Stealing a case of beer?   No.

13 BY MR. CERCONE:

14 Q.   Any beer -- stealing any beer from a gentleman at

15      Salvatore's?

16 MR. GENTILE:   Form.

17 THE WITNESS:   No.

18 BY MR. CERCONE:

19 Q.   By the way, were you in uniform when this

20      incident occurred at Page's?

21 A.   No.

22 MR. GENTILE:   Form.

23 BY MR. CERCONE:

1   Q.   Was your other platoon members in uniform?

2   A.   Two were.   Two of them were.

3   Q.   And who were the two officers in uniform?

4   MR. GENTILE:   Form.

5   THE WITNESS:   Officer Joe Paskiewicz and Joe Wendel.

6   BY MR. CERCONE:

7   Q.   And they were drinking alcohol, correct?

8   MR. GENTILE:   Form.

9   THE WITNESS:   Yes.

10   BY MR. CERCONE:

11   Q.   And that was one of the problems that NFTA

12        Patrolman Delacey had with these guys, drinking

13        alcohol in uniform, correct?

14   MR. GENTILE:   Object to the form.

15   THE WITNESS:   I don't know what his problem is.

16   BY MR. CERCONE:

17   Q.   Well, I thought you said you asked him.

18   A.   He didn't tell me.

19   MR. GENTILE:   Form.

20   BY MR. CERCONE:

21   Q.   So --

22   A.   He said he was a police officer.   I said --

23   Q.   And you said what?

1   A.   I asked him his name.

2   Q.   Okay.  And then what?

3   A.   He told me his name.

4   Q.   And then what?

5   MR. GENTILE:   Form.

6   THE WITNESS:   Then he turned and walked away as I

7        did.

8   BY MR. CERCONE:

9   Q.   Well, what problem did you have in the first

10        place with him?

11   MR. GENTILE:   Form.

12   THE WITNESS:   He was swearing at the officers

13        outside.   The Buffalo police officers.

14   BY MR. CERCONE:

15   Q.   Why was he swearing at them?

16   MR. GENTILE:   Form.

17   THE WITNESS:   I don't know.

18   BY MR. CERCONE:

19   Q.   Well, did you want to find out?

20   MR. GENTILE:   Form.

21   THE WITNESS:   I told you, I asked him what his

22        problem was with them.

23   BY MR. CERCONE:

1  Q.  He never told you, so you just dropped it?

2  MR. GENTILE:  Form.

3  THE WITNESS:  I told you I asked him -- he pulled out

4      his wallet and his badge, showed me his ID and

5      said he was a police officer.

6  BY MR. CERCONE:

7  Q.  So that was the end of it?

8  MR. GENTILE:  Form.

9  THE WITNESS:  I asked him what his name was.

10 BY MR. CERCONE:

11 Q.  And that was the end of it?

12 A.  He walked away.

13 Q.  That was the end of it?

14 MR. GENTILE:  Form.

15 THE WITNESS:  I walked away.

16 BY MR. CERCONE:

17 Q.  So that was the end of it?

18 A.  That was the end of it.

19 Q.  And you never saw any other disturbance with him

20     or any other member of the Buffalo Police

21     Department?

22 MR. GENTILE:  Form.

23 THE WITNESS:  I -- Officer McAndrew got punched and

1        knocked to the ground.  He was on the ground

2        bleeding when I saw him.

3   BY MR. CERCONE:

4   Q.  Who did Officer McAndrew get punched and knocked

5        to the ground by?

6   MR. GENTILE:  Form.

7   THE WITNESS:  I don't know.

8   BY MR. CERCONE:

9   Q.  When you saw Officer McAndrew get punched and

10       knocked to the ground, what did you do?

11  MR. GENTILE:  Form.

12  THE WITNESS:  I picked him up and pulled him out of

13       there.

14  BY MR. CERCONE:

15  Q.  So you didn't try to find out who was the person

16       that punched your fellow officer?

17  MR. GENTILE:  Form.

18  THE WITNESS:  It didn't have anything to do with me.

19       There was about thirty or forty people fighting.

20       I wasn't going to get involved.

21  BY MR. CERCONE:

22  Q.  Was Officer Wendel involved?

23  MR. GENTILE:  Form.

34

1   THE WITNESS:   No.

2   BY MR. CERCONE:

3   Q.   Where was Officer Wendel?

4   A.   I don't know.

5   MR. GENTILE:   Form.

6   BY MR. CERCONE:

7   Q.   What about Officer -- what is it, Joe Paskiewicz?

8        Is that what you said?

9   MR. GENTILE:   Form.

10  THE WITNESS:   Yes.

11  BY MR. CERCONE:

12  Q.   Was he involved?

13  MR. GENTILE:   Form.

14  THE WITNESS:   I didn't see.

15  BY MR. CERCONE:

16  Q.   Who were some of the Buffalo police officers

17       involved that you saw?

18  MR. GENTILE:   Form.

19  THE WITNESS:   I saw Officer Bill Rezabek holding back

20       a couple of people.   And McAndrew.   That was it.

21  BY MR. CERCONE:

22  Q.   Had you ever been disciplined for excessive force

23       prior to May 31st, 2009?

1    MR. GENTILE:  Object.  I ask the witness not to

2        answer the question.  It involves disciplinary

3        procedures, internal -- or internal

4        investigations information which is prohibited

5        from being disclosed due to confidentiality

6        pursuant to New York State Civil Rights Law

7        Section 50 dash small A.

8    MR. CERCONE:  Okay.  I'll be making a motion.  I

9        disagree, because if the department has prior

10        knowledge of these things --

11    MR. GENTILE:  That's fine.

12    MR. CERCONE:  -- it's relevant to the case.

13    MR. GENTILE:  Counsel is certainly welcome to make

14        any motions it so chooses.

15    BY MR. CERCONE:

16    Q.  Sir, were you ever accused of assaulting a patron

17        at a bar on Pearl Street?

18    MR. GENTILE:  Form.

19    THE WITNESS:  No.

20    BY MR. CERCONE:

21    Q.  Was there ever an article in the Buffalo

22        newspaper where you assaulted a patron at a bar

23        on Pearl Street I think even after leaving work

1     early?

2   MR. GENTILE:   Form.

3   THE WITNESS:   No.

4   BY MR. CERCONE:

5   Q.   Was it -- were you ever accused of assaulting

6        anybody at a bar?

7   A.   No.

8   MR. GENTILE:   Object to form.

9   BY MR. CERCONE:

10  Q.   Were you ever accused and it was in the newspaper

11       of assaulting a man in South Buffalo?

12  MR. GENTILE:   Form.

13  THE WITNESS:   No.

14  BY MR. CERCONE:

15  Q.   Were you or any officers in your platoon ever

16       accused of taking beer from the grocery store

17       next to the E District precinct at hours where

18       alcohol was not to be served?

19  MR. GENTILE:   Object to form.

20  THE WITNESS:   No.

21  BY MR. CERCONE:

22  Q.   Sir, where did you attend grammar school?

23  A.   I attended various places due to parish closings.

1           Saint Peter and Paul, Saint Valentine's --

2      Q.   Saint Peter and Paul in Williamsville?

3      A.   Buffalo.  Saint Valentine's parish in Buffalo.

4           Precious Blood in Buffalo.  And Saint Stanislaus

5           in Buffalo.

6      Q.   Where did you grow up then, in the east side of

7           Buffalo?

8      A.   Correct.

9      Q.   Schiller Park area?

10     A.   No.

11     Q.   Where?

12     A.   Clinton/Fillmore.

13     Q.   Where did you attend high school?

14     A.   Bishop Timon.

15     Q.   While you were still living on Clinton and

16          Fillmore?

17     A.   Correct.

18     Q.   When did you graduate from Timon?

19     A.   1983.

20     Q.   After graduating from Timon in 1983, did you

21          receive any other education beyond that?

22     A.   No.

23     Q.   Could you tell me about your -- strike that.

1      When did you start at the Buffalo Police
2      Department?
3  A.  1990.
4  Q.  Between 1983 and 1990, what did you do?
5  A.  I served four years in the United States Marine
6      Corps and worked in a printing shop.  In the
7      remaining time till I was hired by the police
8      department.
9  Q.  Did you receive an honorable discharge from the
10     marine corps?
11 A.  Yes.  With the, the marine corps and United
12     States Armed Forces, expeditionary medals for
13     combat awards.
14 Q.  What printing shop?
15 A.  Cello-Pack in Cheektowaga.
16 Q.  When did you work there, from when to when?
17 A.  From 1987 when I got out of the marine corps
18     until 1990 when I got hired by the police
19     department.
20 Q.  Who was your supervisor over at Cello-Pack?
21 A.  I don't even recall.
22 Q.  Is that business still in operation today?
23 A.  Yes.

```
1   Q.  Where is it located in Cheektowaga?
2   A.  It was on Boxwood.  I'm not sure where it is now.
3   Q.  On Boxwood?
4   A.  Yeah.  It -- it's moved since then.  I'm not sure
5       what street it's on.
6   Q.  And what type of -- it's just a printing shop?
7   A.  Correct.
8   Q.  When you started with the police department in
9       1990, I take it you started as a patrolman?
10  A.  Correct.
11  Q.  How long did you stay a patrolman?
12  A.  Eighteen years.
13  Q.  And roughly in 2008 you received a promotion of
14      some sort?
15  A.  Yes.
16  Q.  And what was that to?
17  A.  Lieutenant.
18  Q.  And did you remain a lieutenant till you retired
19      in 2011?
20  A.  Yes.
21  Q.  When you first were appointed lieutenant, was
22      that while you were at the E District?
23  A.  I was assigned to the E District.  That was my
```

1        initial assignment as lieutenant.

2   Q.   Who was the chief while you were assigned to the

3        E District?

4   A.   Fred Young.

5   Q.   Did Fred Young stay the chief at that district

6        until 2011?

7   A.   Yes.

8   Q.   Were you reassigned to the C District for any

9        reason?

10  A.   Excuse me?

11  Q.   Were you ever reassigned to C District for any

12       reason?

13  A.   No.

14  Q.   Did you ever work over in the C District?

15  A.   Yes; as a patrolman.

16  Q.   Was that due to some reassignment?

17  A.   No.  I chose to go there in 2000.

18  Q.   Were you working back on May 30th, 2009?  That

19       was the day of this incident.

20  A.   Oh.  Yes.

21  Q.   What time -- what shift would you have been

22       working at that time?

23  A.   Eight p.m. till six a.m.

1  Q.  And how did it come about that you met Mr.

2      Campbell and Mr. Silmon that are present here

3      today?

4  A.  They were placed under arrest for shooting

5      someone with a BB gun.

6  Q.  How did you become aware of that?

7  A.  Aware of what?

8  Q.  That they were -- allegedly had shot someone with

9      a BB gun?

10  A.  The description had come out by the people that

11      were shot with the plate number of the vehicle.

12  Q.  Did you interview anybody to receive that

13      information or were you told that by somebody?

14  A.  I was told that by -- over the radio.

15  Q.  And after you were told that information over the

16      radio, what, if anything, did you do?

17  A.  Went and parked up on Main Street seeing if the

18      vehicle would pass by on Main Street.

19  Q.  And were you wearing a white short-sleeved-shirt

20      uniform at the time?

21  A.  Yes.

22  Q.  Were you in a marked patrol unit?

23  A.  Yes.

1   Q.   You parked where on Main Street?

2   A.   I don't recall.

3   Q.   And what was the next bit of information you

4        received regarding these two young men?

5   A.   I believe that Cheektowaga was behind the vehicle

6        in E District.

7   Q.   And after receiving that information, did you

8        drive over to that address?

9   A.   Yes.

10  Q.   Did you go back to E District at all?

11  A.   Prior to that?

12  Q.   Prior to that.

13  A.   No.   At least I don't think I did.

14  Q.   Was there any special platoon or unit out to get

15       Mr. Parker or Mr. Silmon?

16  MR. GENTILE:   Form.

17  THE WITNESS:   There was a two-man overtime detail

18       authorized by the commissioner of police for one

19       week I believe to try and apprehend them due to

20       the mass amount of crimes they had committed in

21       the prior weeks.

22  BY MR. CERCONE:

23  Q.   Now, you say crimes they committed.   What, if

1    any, evidence whatsoever at all do you have these

2    two young men committed any other alleged

3    offenses?

4  MR. GENTILE:  Object to the form.

5  THE WITNESS:  The crime reports and descriptions of

6    the vehicles and the method of operation of the

7    crimes that took place in that short period of

8    time.

9  BY MR. CERCONE:

10 Q.  And where are these crime reports?  Where would

11    they be kept?

12 A.  They'd be on file in the police computer.

13 Q.  At the E Precinct?

14 A.  I'm sure every Buffalo Police Department computer

15    would have access to them.  Mainly headquarters

16    I'm sure.

17 MR. CERCONE:  Again, Carmen, I made that request last

18    time.  I'm renewing the request.  We haven't

19    received the transcript, so I haven't had the

20    request page given to me yet.  I'm renewing it

21    now.

22 MR. GENTILE:  Okay.  Any requests must be placed in

23    writing.

1   BY MR. CERCONE:

2   Q.   Other than this alleged hearsay crime reports, do

3        you have any knowledge of these two young boys

4        doing anything other than what was alleged on the

5        night in question?

6   A.   Other than shooting two people with a BB gun?

7   Q.   Other than the allegations on the night in

8        questions, anything else?

9   A.   Other than them being interviewed by the

10       detective and all implicating each other in

11       previous crimes that I just mentioned, no.

12  Q.   So if they implicated each other in previous

13       crimes, that would have to be written down on a

14       710.30 statement, correct?

15  A.   Like I said, I have -- the detective -- I got

16       that information from the detective that

17       interviewed them.

18  Q.   Captain Stabler?

19  A.   Detective Keane.

20  Q.   Oh, it wasn't Detective Stabler that did the

21       interview?

22  A.   He's a captain.

23  Q.   Excuse me.  So it was Detective Keane?

1    A.    Correct.

2    Q.    So Detective Keane told you they all implicated

3          each other in previous shootings, correct?

4    A.    Correct, but would not admit to doing -- each one

5          would implicate each other he said, but they

6          would not admit their role in it.

7    Q.    So, but those would still have to be written down

8          on 710.30's because it was accomplice statements?

9    A.    I'm just relaying what Captain Keane told me.

10   MR. GENTILE:   Object to the form.   You asked him the

11         question and he answered the question.

12   MR. CERCONE:   I'm asking him procedurally whether

13         they should be written down on a 710.30

14         statement.   He didn't answer that.

15   MR. GENTILE:   Object to the form.

16   THE WITNESS:   I don't know if he has statements from

17         them or not.   I don't know.   He may have

18         statements from them.   I don't know that.

19   BY MR. CERCONE:

20   Q.    So he told you they gave statements, but you

21         never saw them?

22   A.    No.   I just told you exactly what he told me.

23         That's not going to change.   I told you he told

```
 1        me they implicated each other in the previous

 2        crimes, they would not claim a role in them

 3        crimes and that's all he told me.

 4   Q.   And being a former assistant district attorney,

 5        if they gave statements implicating each other as

 6        accomplices, whether or not they admitted,

 7        procedurally those statements would be -- would

 8        have been written down?

 9   A.   Sir, it's fine and -- well, you were district

10        attorney, but, like I said, I don't know.  I

11        didn't do the interview, so the person doing the

12        interview, you know, is the one who would

13        transcribe either a statement or 710.30, not a

14        secondhand information from me.

15   Q.   I'm not saying you were the one responsible for

16        writing the 710.30.  I'm saying procedurally --

17        you were a police officer how long?

18   A.   Twenty-one years.

19   Q.   Twenty-one years.  And you know that if you took

20        statements from alleged suspects and they

21        implicated each other in other crimes --

22   A.   Correct.

23   Q.   -- that you procedurally would have to write
```

1      those down on 710.30 statements, correct?

2  A.  Or there was a statement taken and he has a copy

3      of the statement somewhere.  That's what I'm

4      saying.

5  Q.  And that would be after waiving their Miranda

6      rights they would have made the statements,

7      correct?

8  A.  Yes.

9  Q.  Were you ever aware that any such statement was

10     ever produced in this case or any other case

11     regarding these two boys?

12 A.  I don't know.  Not to my knowledge.

13 Q.  Now, sir, when you go over to an address that you

14     hear on the radio, what address is it?

15 A.  I believe it was on Treehaven.  I don't recall

16     the address.

17 Q.  And you took what route to get there?

18 A.  I believe Winspear.

19 Q.  Winspear to Bailey to Treehaven, or does Winspear

20     become Treehaven once you cross -- excuse me,

21     Winspear become Treehaven once you cross Eggert?

22 A.  It's going to sound ridiculous, but I'm not

23     positive if it becomes Treehaven after you cross

1     Winspear.

2  Q.  Well, when you pull up on the address, was the

3     house on your right or left?

4  A.  Left.

5  Q.  Where did you park in relation to that house?

6  A.  In the street.

7  Q.  Where in the street?

8  A.  Alongside the curb.

9  Q.  On which side of the street, on the side that the

10     house was on or across the street from it?

11  A.  The side the house was on.

12  Q.  Were you facing the direction in which you pulled

13     up?

14  A.  Yes.

15  Q.  So you didn't turn around to get your car parked

16     in what would be the normal traffic heading on

17     the right side, correct?

18  A.  I don't think so.

19  Q.  And you were by yourself at that time in that

20     marked unit?

21  A.  Yes.

22  Q.  And were you the first Buffalo police officer at

23     the scene?

1    A.   Yes.

2    Q.   And what did you find or see when you first

3         arrived there?

4    A.   Cheektowaga was just removing them from the car I

5         think.

6    Q.   How many Cheektowaga police officers were there?

7    A.   I don't recall.

8    Q.   Was there more than one Cheektowaga police car

9         there?

10   A.   I don't remember.

11   Q.   Did you see any --

12   A.   I, I saw a Cheektowaga officer.  I don't recall

13        honestly if there was one, two.  I don't, I don't

14        know.

15   Q.   And how many -- other than -- strike that.  Other

16        than a Cheektowaga police officer, one or more,

17        who else did you see at this location?

18   A.   Just the vehicle and the defendants.

19   Q.   How many defendants?

20   A.   Four.

21   Q.   And they were getting out of the car?

22   A.   I believe they were, yes.

23   Q.   Did you assist the Cheektowaga police officer in

1      getting them out of the car?

2  A.  No.  They had already just gotten taken out of

3      the vehicle when I arrived.

4  Q.  So they were not getting out of the car, they

5      were already out of the car; would that be

6      accurate then?

7  A.  Some were -- I think the last one might have been

8      getting out of the vehicle when I pulled up.  I

9      don't recall exactly.

10 Q.  And the three that were already out of the

11     vehicle, where were they in relation to the car?

12 A.  They were on their -- they were on the car that

13     they were driving.

14 Q.  Okay.  And in what fashion were they on the car?

15 A.  Their hands were on the car.

16 Q.  They were not facing -- their faces were not on

17     the car, were they?

18 A.  No.

19 Q.  Was anyone handcuffed?

20 A.  No.

21 Q.  So what is the first thing you did when you went

22     over there?

23 A.  Began handcuffing.  Searching and handcuffing.

1  Q.  Who was the first person that you went up to to

2      search and handcuff?

3  A.  I don't recall.

4  Q.  Do you recognize Mr. Campbell who's present here

5      today?

6  A.  I didn't know who he was until, when he walked

7      in, I asked Carmen if that's who it was.

8  Q.  Okay.  So you don't recognize Mr. Campbell that's

9      here today?

10 A.  No.

11 Q.  Do you recognize Mr. Silmon who's here today?

12 A.  Just from the other day when I met you.

13 Q.  So you didn't recognize him from the incident

14     that occurred back on May 31st, 2009?

15 A.  That's correct.  And as far as the other two, I

16     could pass them in the hallway probably and not

17     have any idea who they are.

18 Q.  Were the alleged -- were the boys on various

19     sides of the vehicle that was in the driveway?

20 A.  Yes.

21 Q.  Was the vehicle facing into the driveway towards

22     the home?

23 A.  I believe it was.

1   Q.   And on which side of the vehicle did you go to

2        cuff the first person?

3   A.   I believe the passenger's side.

4   Q.   And where was the Cheektowaga police officer

5        while you were at the passenger's side?

6   A.   I don't recall.

7   Q.   Do you recall the Cheektowaga police officer's

8        vehicle maybe being behind their vehicle in the

9        driveway?

10  A.   I have no idea.

11  Q.   You'd have no reason to disagree; would that be

12       fair to say?

13  MR. GENTILE:   Form.

14  THE WITNESS:   I have no reason to agree or disagree.

15       I have no idea.

16  BY MR. CERCONE:

17  Q.   So you go up to the passenger's side and you

18       handcuff this person, is that correct?

19  A.   I began searching him.

20  Q.   Did you search him before you handcuffed him?

21  A.   Yes.

22  Q.   Did you find anything on him?

23  A.   Not that I recall.

53

1   Q.  If you had found anything illegal or some

2      contraband of some sort, you would have had to

3      note that or given that information to the

4      arresting officer, correct?

5   A.  Correct.

6   Q.  After you did not find anything on him, what did

7      you do then?

8   MR. GENTILE:  On him.  The first --

9   MR. CERCONE:  Yes.  Well, whatever he did.  I mean,

10    he might have left him and went to someone else.

11    I don't know.

12  THE WITNESS:  He was handcuffed.

13  BY MR. CERCONE:

14  Q.  After you handcuffed him, what did you do?

15  A.  Went to handcuff and search another one of them.

16    I carry two sets of handcuffs.

17  Q.  And where did you leave the first person that you

18    handcuffed?

19  A.  Leaned over the car.

20  Q.  Did this person fight or resist with you in any

21    fashion?

22  A.  Yes.

23  Q.  Okay.  Did you charge with him resisting arrest?

54

1    A.   No.

2    Q.   And why didn't you charge him with resisting

3         arrest?  You were just going to be a good guy to

4         him or do a favor?

5    MR. GENTILE:  Object to the form.  Go ahead.

6    THE WITNESS:  It was more so of him getting off the

7         car, pushing off the car saying, you know, I

8         didn't fucking do anything, what are you doing.

9         You know, more being belligerent and

10        uncooperative and pushing off the vehicle.

11   BY MR. CERCONE:

12   Q.   So did you charge him with disorderly conduct for

13        being belligerent in a public place?

14   A.   No.  I don't believe so.

15   Q.   So you did him a favor by not charging him with

16        disorderly conduct?

17   MR. GENTILE:  Form.

18   THE WITNESS:  The charges that they had -- disorderly

19        conduct is only a violation.  They were being

20        charged with felonies.  It didn't seem worthwhile

21        to do.

22   BY MR. CERCONE:

23   Q.   So you've never charged people with disorderly

```
 1        conduct after charging them with felonies, is
 2        that what you're saying?
 3  A.    Out of all the gun arrests and shooting arrests
 4        that I've made in my career, when I do catch
 5        someone, I -- and they start swearing at me
 6        because I'm arresting them for shooting someone,
 7        no, I've never charged assault second or assault
 8        first with a disorderly conduct for using obscene
 9        language in a -- in an arrest.  No, I have not.
10  Q.    Now, the person that you claim was resisting,
11        they just turned to say I didn't do anything?
12  A.    No.  They were swearing saying I didn't fucking
13        do anything, what are you doing.  Along those
14        lines.
15  Q.    So, I didn't fucking do anything, that's not a
16        crime, is it?
17  MR. GENTILE:  Form.
18  THE WITNESS:  Pushing, no.  You just said disorderly
19        conduct.  I guess it would be a crime.
20  BY MR. CERCONE:
21  Q.    That's not a violation, is it?  It's not even a
22        disorderly conduct?
23  MR. GENTILE:  Object to the form.
```

56

| | |
|---|---|
| 1 | THE WITNESS:  You just told me it was. |
| 2 | BY MR. CERCONE: |
| 3 | Q.  No, I didn't.  I asked you if you charged them |
| 4 | with that.  I mean, you've been a police |
| 5 | officer -- |
| 6 | A.  Well, then you should know, being a former DA, |
| 7 | that swearing in a public place is DO.  Correct. |
| 8 | Q.  Is that causing a disturbance? |
| 9 | A.  Sure.  People were trying to sleep. |
| 10 | Q.  So you saw people were disturbed by this, by |
| 11 | people using the word fuck? |
| 12 | A.  I didn't -- |
| 13 | MR. GENTILE:  First of all, I don't know what is so |
| 14 | funny.  I would instruct your clients to behave |
| 15 | in a professional legal decorum. |
| 16 | MR. CERCONE:  Carmen, they are.  If his testimony |
| 17 | isn't making sense and it's preposterous, then |
| 18 | it's a natural reaction.  They're not doing |
| 19 | anything.  I don't want you to put on the record |
| 20 | like they're doing anything.  If they chuckle |
| 21 | because the testimony is preposterous, put it on |
| 22 | the record that I was laughing too. |
| 23 | MR. GENTILE:  It's been occurring throughout the |

1        officer's testimony.  I find it very

2        unprofessional.  Secondly, please do not be

3        belligerent and argumentative.  You're here to

4        ask questions.  If you don't like an answer,

5        that's unfortunate, but to repeat the question

6        several times and engage in an argumentative

7        discourse with the witness is also not subject to

8        normal deposition rules.

9    MR. CERCONE:  Thank you.  Okay.  Now, you can

10       describe it on the record as being argumentative,

11       but it's not when you're not getting the answer.

12       And if the officer tells you one thing and goes

13       back on it -- I mean, that's my job.  It's not

14       being argumentative.  It's my job and I'm going

15       to do my job.

16   BY MR. CERCONE:

17   Q.   Sir, are you saying any time someone uses a swear

18        word in public it's disorderly conduct?

19   A.   It is according to the law, yes.

20   Q.   Have you ever used a swear word in public?

21   MR. GENTILE:  Form.

22   THE WITNESS:  Yes.

23   Q.   On numerous occasions, I would imagine?

```
 1   A.   Yes.

 2   Q.   Did any of your fellow officers ever arrest you

 3        for it?

 4   A.   No.

 5   Q.   Okay.  So this person that you claimed was

 6        resisting arrest simply said I didn't fucking do

 7        anything and you call that resisting arrest

 8        because they looked back to tell you?

 9   A.   I didn't say resisting arrest.  You did.

10   Q.   I asked if he resisted you in any fashion and you

11        said yes.

12   A.   I said he was being uncooperative pushing off the

13        car.  That's what I said.

14   Q.   Okay.  So he did not resist you, is that now your

15        testimony just so I'm clear?

16   A.   Him pushing off the car and being uncooperative

17        is not resisting arrest in my opinion.

18   Q.   When you say he pushed off the car, that was to

19        turn to tell you he didn't do anything, correct?

20   A.   I don't know why he was pushing off the car.  He

21        was being uncooperative.

22   Q.   Well, you said when he pushed off the car, that's

23        when he said I didn't do anything, correct?
```

1  A.  He repeatedly pushed off the car.  Not just once.

2  Q.  When you say pushed off the car, you mean lifting

3      his face off the hood?

4  A.  Lifting his hands off the car when I was

5      searching him, being uncooperative.  That's what

6      I mean.

7  Q.  Well, uncooperative is a characteristic.  I want

8      to know factually what he did.  You had

9      handcuffed him, correct?

10 A.  That's correct.

11 Q.  So he wasn't putting any hands anywhere because

12     they were handcuffed behind his back, correct?

13 A.  That's correct.

14 Q.  That's when you said he lifted it up.  I don't

15     think --

16 A.  They had him leaned over the car with his chest

17     on the car.

18 Q.  And he said I didn't do anything?

19 A.  That was before when I was going to handcuff him

20     and search him.

21 Q.  Did you ever have any suspect as you were placing

22     handcuffs on them ever tell you I didn't do

23     anything?

1   A.   Yes.

2   Q.   That's not unusual, is it?

3   A.   No.

4   Q.   So other than this person turning to look at you

5        to say he didn't do anything, did he do anything

6        else that you allege was uncooperative or

7        resisting arrest in any fashion?

8   A.   He kept pushing off the car.  I would tell him

9        get his hands on the car.

10  Q.   This is after you handcuffed him and put him on

11       the car.

12  A.   Yes.

13  Q.   Okay.  Because he wasn't moving his hands at that

14       point.  So after you handcuffed him -- and you

15       put him face first on the car, is that correct?

16  A.   Yes.

17  Q.   And in what manner did you put him face first on

18       the car?  Did you push his face into the hood of

19       the car?

20  A.   No.  He was leaned over.  I told him to stay

21       there.

22  Q.   You did not push him at any time?

23  A.   No.

1   Q.   When he lifted to tell you anything, did you ever

2        strike this person and hit him in the face?

3   A.   No.

4   Q.   Even if the person was lifting to talk to you,

5        you would have no authority to do that, correct?

6   A.   Correct.

7   Q.   And this person that had his hands cuffed behind

8        his back and had looked to tell you that he

9        didn't do anything, are you claiming he did

10       anything else to resist arrest or did he do

11       anything at all to resist arrest?

12  A.   Other than getting off the vehicle, no.  At that

13       point, no.

14  Q.   Well, where did he get off the vehicle and go?

15  A.   Where did he go?

16  Q.   Yes.

17  A.   He didn't go anywhere at that point.

18  Q.   Okay.  Did he just turn to look at you?

19  A.   No.

20  Q.   Is that what you meant by getting off the

21       vehicle?

22  A.   No; stand up off the vehicle.

23  Q.   So he was just standing there with his hands

1  cuffed behind his back?

2 A. Correct.

3 Q. And that's all he did.  I mean, he didn't try to

4  flee or anything like that?

5 A. At that point, no.

6 Q. Well, at any point did he try to flee?

7 A. When I was walking and went to the car, one did.

8 Q. Was it Mr. Campbell?

9 A. I don't remember who I walked to the car.

10 Q. It wasn't Mr. Silmon, was it?

11 A. I don't recall.

12 Q. So you're saying one tried to run away from you?

13 A. Correct.

14 Q. Did you tackle him?

15 A. No.

16 Q. How far did he get?

17 A. He didn't get very far at all.  I pulled him

18  right back.

19 Q. Well, did you have your hand on him at the time?

20 A. Yes.

21 Q. Are you saying he took a step in some direction?

22 A. He pulled to run.

23 Q. Did you ever lose contact with him?

63

1   A.   No.

2   Q.   So you had your hand on him and you're saying

3        some other gentleman tried to run while he was

4        handcuffed behind his back?

5   A.   What other gentleman?

6   Q.   One of the other boys, these four boys.

7   A.   Whoever I was walking back to the car.

8   Q.   By the way, when you were doing that, Officer

9        Wendel was at the scene, correct?

10  A.   Yes.

11  Q.   Officer Krug was at the scene, correct?

12  A.   Correct.

13  Q.   And they had separate cars, didn't they?

14  A.   They weren't in my car, no.

15  Q.   Well, I mean they had separate units themselves,

16       correct?

17  A.   That -- I don't recall if they were in the same

18       car or if they were separate.

19  Q.   And then you had at least one or more Cheektowaga

20       police officers, correct?

21  A.   Yes, sir.

22  Q.   And all these police officers are around and

23       you're saying this guy tried to run from you

1      handcuffed?

2   A.   Yes.

3   Q.   And had he been drinking at all to your

4        knowledge?

5   MR. GENTILE:   Who?

6   MR. CERCONE:   This person that allegedly tried to run

7        from him.

8   THE WITNESS:   No.  I don't --

9   BY MR. CERCONE:

10  Q.   In fact, you didn't smell alcohol on any of these

11       individuals, did you?

12  A.   Not that I recall.

13  Q.   You didn't find any drugs on any of these

14       individuals, did you?

15  A.   Not that I recall.

16  Q.   Now, that's the first person you dealt with.  Who

17       was the next person you dealt with at the scene?

18  A.   I don't recall.

19  Q.   The person that you had and you claim tried to

20       run from you, what car did he ride to the station

21       in?

22  A.   It may have been mine.  I don't know.

23  Q.   Well, how many cars took these four suspects to

1      the station?

2  A.  Like I said, I don't remember.

3  Q.  After you placed this first person in the car,

4      then what did you do?

5  A.  Went back and I believe walked another one to the

6      car.

7  Q.  Was this person handcuffed already?

8  A.  I had handcuffed another person.

9  Q.  So you handcuffed them both at the scene?

10 A.  I used two sets of cuffs; correct.

11 Q.  So this first person that you claim allegedly

12     tried to run, at some point you apparently let go

13     of him to go handcuff another person, is that

14     correct?

15 A.  Yes, but you're kind of blurring the time line.

16 Q.  Well, I'm asking you to tell me.

17 A.  When he ran, that was after they were both cuffed

18     already.

19 Q.  That was my whole point.  So before he allegedly

20     ran as you say --

21 A.  It wasn't alleged.  I testified that's what

22     happened.  You said alleged.  I didn't say

23     alleged.  You said it.

1   Q.   Can I finish my question?

2   MR. GENTILE:   Object to the form.

3   BY MR. CERCONE:

4   Q.   So after this person allegedly ran as you say --

5        or before this person allegedly ran as you say,

6        you had handcuffed him at the car and handcuffed

7        another individual, correct?

8   A.   Correct.

9   Q.   All right.   Now, when you handcuffed this first

10       person, I assume you let him go to go handle and

11       search the other person?

12  A.   Correct.

13  Q.   And you searched the other person and cuffed that

14       person, correct?

15  A.   Correct.

16  Q.   Yet this first person didn't try to run at that

17       point when nobody was touching him, correct?

18  A.   Correct.   He kept on trying to get off the car

19       like I stated earlier and I kept saying get back

20       on the car.

21  Q.   When you say get off, it means look up from the

22       car?

23  MR. GENTILE:   Form.

1    THE WITNESS:   No.   It means stand up.   I had him

2       placed there.   He would repeatedly get off the

3       car and stand up and turn.

4   BY MR. CERCONE:

5   Q.   This is a person that was handcuffed behind his

6        back, correct?

7   A.   Yes.

8   Q.   And the only thing he did is he lifted his face

9        off the car to a standing position, correct?

10  A.   And turned towards -- away from the car.

11  Q.   And just stood there, correct?

12  A.   The whole point of them staying on the car --

13  Q.   He just stood there?   I'm asking what he did.

14  A.   When he would get to that point, I would push him

15       back on the car and tell him to stay there for

16       control purposes.

17  Q.   So when he stood and you're saying he turned away

18       from the car, did you have to turn him back

19       around and face him on the car?

20  A.   Yes.

21  Q.   Did you slam his face on the car because he

22       lifted his face from the hood?

23  A.   No.   I pushed him back down I believe at least

1         two times to stay onto the car.

2    Q.   In what manner would you describe that?

3    A.   Onto his back and push his body forward onto the

4         car.

5    Q.   I'm asking the severity of it.  How would you

6         describe it; gentle, hard?

7    A.   It wasn't gentle.  It wasn't nothing crazy hard

8         either.  It was, you know, command position of

9         force to tell him to stay on that car.

10   Q.   Where was this other person that you were

11        searching and handcuffing when this first person

12        allegedly did this?

13   A.   I believe he was on the same side of the car.

14   Q.   Were they standing side by side?

15   A.   They were on the same side of the vehicle.  From

16        what I recall.

17   Q.   What type of vehicle was it?

18   A.   A four-door Buick I want to say.  Does that sound

19        right?

20   Q.   Well, where was, where was the second suspect

21        when you were searching and handcuffing him?

22   A.   He was on the same side of the vehicle.

23   Q.   Where in relation to that side?

1    A.   Like I said, I'm saying he's on the same side of

2         the vehicle.   That's all I remember is he was on

3         that side of the vehicle.

4    Q.   Well, was he on the front hood or the back trunk?

5    A.   If I knew I would answer you.   I don't remember.

6    Q.   And this first suspect, where was he on that side

7         of the vehicle?   Was he towards the back hood or

8         -- the back trunk?

9    A.   He was towards the back, yes.

10   Q.   The second person, did he say anything to you?

11   A.   Same demeanor, you know.

12   Q.   So he was swearing at you as well?

13   A.   They didn't do anything, why are they getting

14        stopped.   It was -- I don't remember exactly.

15        Like I said, it's -- I can only tell you what I

16        remember.   Same demeanor as the first one.

17   Q.   And you weren't aware that these two gentlemen

18        had already told the Cheektowaga that they gave

19        him the BB gun?

20   A.   No.

21   Q.   Didn't the Cheektowaga police officer give you

22        the BB gun that they found?

23   A.   After they were cuffed.   After they were

1  handcuffed.  He said it was on the floor.  The BB
2  gun's on the floor.
3  Q.  Did you ever ask these gentlemen where there was
4      a BB gun?
5  A.  Who?
6  Q.  The gentlemen that you were cuffing.
7  A.  I don't recall if I asked.
8  Q.  Okay.  Typically if you got a radio transmission
9      that there was alleged shooting with a BB gun and
10     you were arresting the suspects, wouldn't you try
11     to ask them some questions about the incident?
12 A.  I really didn't have time to ask questions at
13     that point in time.
14 Q.  Do you know if the Cheektowaga police officer
15     asked them questions?
16 A.  No, I don't.
17 Q.  Do you know if anyone asked any of the suspects
18     was there a BB gun in the car?
19 A.  All I remember is the Cheektowaga officer saying
20     it was on the floor, on the front seat floor.
21 Q.  Where on the front seat floor?
22 A.  I don't recall exactly.  I just remember him
23     pointing it out to me and handing it.

1   Q.   And after you got the gun, did you ask any of the

2        suspects is this your gun?

3   A.   I don't recall.

4   Q.   Wouldn't that be ordinarily something that you

5        would do in the course of an investigation?

6   A.   I may have.  I just don't remember if I did and --

7   Q.   I'm not saying whether you did or not.  I'm just

8        saying ordinarily wouldn't that be something you

9        typically do in an investigation?

10  A.   Ask who's gun, yes.

11  Q.   If I can finish my question.

12  A.   I thought you were done talking.  You were waving

13       your hands.

14  Q.   You have to wait for me to finish --

15  A.   I understand.

16  Q.   -- because she can only type down what you say

17       and then what I say.  Just because the

18       stenographer's not sure if she got it, I'm going

19       to rephrase it.  Regardless whether you remember

20       doing it or not, I'm saying ordinarily wouldn't

21       that be one of the things that you would want to

22       do is to question the suspects to try to find out

23       whose gun -- if someone had a gun, whose gun it

1      was, correct?

2  A.  Yes.

3  Q.  Was there allegations that two suspects allegedly

4      shot at some kids?

5  A.  At the people that got shot?

6  Q.  Correct.

7  A.  Just the description of the vehicle.

8  Q.  Did you find in the course of your investigation

9      that there were two guns found?

10 A.  Were there?  I -- no.  I wasn't aware of that.

11 Q.  The second suspect that you said acted similar to

12     the first, what did you do with him?

13 A.  Handcuffed him.

14 Q.  And where did you take him?

15 A.  Into one of the police cars.  Like I don't recall

16     if I drove them back or if I placed them in

17     another police vehicle.  Buffalo one.

18 Q.  What did you do after you placed the second

19     suspect in a vehicle?

20 A.  I believe called for the tow truck to come

21     impound the vehicle.

22 Q.  In addition to Officer Krug and Officer Wendel,

23     do you know if there were other Buffalo police

1    officers at the scene?

2  A.  I don't believe so.  I don't recall any.

3  Q.  Is it unusual or is it ordinary policy and

4    procedure for a lieutenant to transport the

5    suspects from an incident scene?

6  A.  Oh, it's usual course of business, especially for

7    myself and other lieutenants.  We were pretty

8    shorthanded in a busy district, so you do pretty

9    much the work of a patrolman.

10  Q.  So when you say especially for yourself, that's

11    what you mean?

12  A.  I would do it, yes.

13  Q.  Did you ever find a gun in addition to the one

14    the Buffalo -- or, strike that.  Did you ever

15    find a gun in addition to the one the Cheektowaga

16    police officer gave you?

17  A.  Not to my knowledge, no.

18  Q.  Did you ever radio that you had found guns at the

19    scene?

20  A.  I don't recall doing that.

21  Q.  Would that be something you would ordinarily do?

22  MR. GENTILE:  Form.

23  BY MR. CERCONE:

1    Q.   Let dispatch know that you found guns?

2    A.   Yes.

3    Q.   And arrested the suspects and are taking them

4         back to the precinct?

5    A.   Yes.

6    Q.   What were your call numbers that night?

7    A.   I was always E five five one.

8    Q.   You said you were always that call number?

9    A.   Unless there was some rare occurrence once in a

10        great while if I may be a different call night.

11   Q.   But as best you remember, that night you probably

12        would have been E five five one as well?

13   A.   That's correct.

14   Q.   So after you placed two suspects in vehicles,

15        what, if anything, else did you do at the scene?

16   A.   Called for a tow truck I believe to come pick up

17        the car.

18   Q.   By the way, did Officer Wendel and/or Krug cuff

19        the other two suspects?

20   A.   I believe they did, yeah.

21   Q.   Were you in close proximity to them when they did

22        that?

23   A.   I was there.

```
 1   Q.   Well, did you hear these other two suspects say
 2        or do anything?
 3   A.   They said -- they were all pretty much
 4        belligerent.  That's all I remember.
 5   Q.   All four of them?
 6   A.   From what I remember, yes.
 7   Q.   So all four were swearing.  Is that what you mean
 8        by belligerent?
 9   A.   Being uncooperative, you know.  And I -- like I
10        said, I don't recall exactly what was said, I
11        don't remember, but I just recall their demeanor.
12   Q.   Did any of the other alleged suspects try to run
13        away and flee?
14   A.   Not to my knowledge.
15   Q.   Did any of the other suspects -- strike that,
16        because I think you said the first suspect didn't
17        resist arrest.  So did any of the suspects resist
18        arrest in any fashion?
19   A.   Just uncooperative as I stated earlier.
20   Q.   Uncooperative is your characteristic.  I'm asking
21        factually what did they do without you labeling
22        it?
23   A.   Other than to state what I already stated,
```

1       exactly what was said exactly I couldn't tell you

2       because I don't recall.  Just their demeanor, I

3       told you, pushing off the car.  Being

4       uncooperative, not staying on the car, being

5       belligerent in their speech, using swear words.

6   Q.  All four of them were like that?

7   A.  From what I recall, yes.  Like I said, I don't

8       recall one individual from the other who's who.

9   Q.  And did you ever ask anybody at the scene whether

10      the gun that the Cheektowaga police officer gave

11      you was their gun?

12  A.  I don't recall.

13  Q.  Did you ever ask anyone at the scene whether or

14      not they liked shooting white people?

15  A.  No.

16  Q.  Were you aware that the suspects were white that

17      they shot at?

18  A.  No.

19  Q.  Who left the scene first, if you remember?

20  A.  I don't recall.

21  Q.  Well, where did you go when you left the scene?

22  A.  To the stationhouse.

23  Q.  For what purpose did you go to the stationhouse?

1   A.   To be interviewed, the suspects, by Detective

2        Keane.  Due to the huge caseload that he had of

3        the crimes.

4   Q.   Do you remember when you arrived at the precinct

5        in relation to Officer Wendel and Officer Krug?

6   A.   No.

7   Q.   Did you ever talk to Officer Wendel and/or Krug

8        and tell them to bring one of the suspects

9        through a different entrance than the entrance

10       you were using?

11  A.   No.  The only conversation that we had when we

12       had arrived there was one of them informed me

13       that it was Officer Parker's son.  One of the

14       people involved that we arrested.

15  Q.   Who informed you that it was Officer Parker's

16       son?

17  A.   It was either Wendel or Krug.  I don't recall

18       which one.

19  Q.   So you're saying Wendel or Krug knew at the

20       scene?

21  A.   No, at the stationhouse.

22  Q.   Is this while they were walking them in?

23  A.   I don't recall when it was.

1   Q.   Was that shortly though after you arrived that´
2        you became aware of that?
3   A.   Yes.
4   Q.   And what, if anything, did you do after being
5        advised that one of the suspects was Officer
6        Parker's son?
7   A.   Well, they obviously know that Officer Parker and
8        myself have a history, so when they informed me
9        of that, I told them to make sure that everything
10       is properly done.  Their I's are dotted and the
11       T's are crossed and everything's done according
12       to the strict letter of the book on this one so
13       there's no problems.
14  Q.   Did you take any of the defendants into the
15       stationhouse?
16  A.   I believe I did.
17  Q.   How many?
18  A.   I don't recall.  I believe I did.  I don't
19       recall, you know, one or two.  I don't recall.  I
20       remember walking in with them.
21  Q.   Okay.  You remember walking in what entrance with
22       them?
23  A.   The rear door.

1   Q.   Did you ever go through the garage?

2   A.   No.

3   Q.   Do you know if Officer Wendel brought anyone

4        through the garage?

5   A.   No.   They were -- from what I recall, everybody

6        was brought through that rear door.

7   Q.   Did you get there before Officer Wendel?

8   A.   I don't recall.

9   Q.   At the stationhouse did any of the boys act up?

10  A.   No.

11  Q.   So there would have been no reason to strike, hit

12       or punch them in any way, shape or fashion?

13  A.   Correct.

14  Q.   In fact, there was no reason to strike, punch or

15       hit them while at the scene, was there?

16  A.   Correct.

17  Q.   Did they complain of any injuries to you?

18  A.   No.

19  Q.   Did you notice any marks on any of the boys?

20  A.   No.

21  Q.   Do you remember what any of them were wearing?

22  A.   No.

23  Q.   Do you know if they had pants or shorts on?

80

1  A.  I don't remember.

2  Q.  Was there ever any allegations that these four

3      suspects had been shot at?

4  A.  Not that I recall, no.

5  Q.  Did you question any of the boys while they were

6      at the station?

7  A.  Detective Keane did.

8  Q.  Did you have any conversations with any of the

9      boys while they were at the station?

10 A.  Not really, no.

11 Q.  Did you take them down to the holding center

12     after they left the station?

13 A.  I don't believe I did.

14 Q.  How long were they at the --

15 A.  I mean, I don't, I don't believe I did.  I don't

16     recall.  I don't think I did.

17 Q.  How long were they at the station?

18 A.  Couple hours I'm going to guess.

19 Q.  And what happened during that couple-hour period

20     of time?

21 A.  They were all separately interviewed by

22     Lieutenant Keane.  I mean Detective Keane.

23 Q.  In addition to that, anything else happen while

1     they were there?

2  A.  I don't know if Officer Parker was trying to call

3     and contact the officers at that time or until

4     later, but other than that, no.

5  Q.  Did you ever hear Officer Parker on the radio --

6  A.  Yes.

7  Q.  -- trying to contact anybody?

8  A.  Yes.

9  Q.  And did you tell -- was she looking for Officer

10    Wendel?

11  A.  She was trying to contact Officer Wendel on the

12    police radio on the main channels asking to speak

13    with him.  I knew she was not on duty at that

14    time, and she was improperly using a police radio

15    at that time and getting involved in an arrest

16    that was already taking place, and at which time

17    I got on the air and stated if there was any

18    questions, contact Lieutenant Kwiatkowski.

19  Q.  Did you instruct Officer Wendel then not to

20    contact her?

21  A.  Yes.

22  Q.  Did you know that she was just trying to find out

23    what happened to her son?

1  MR. GENTILE:  Form.

2  THE WITNESS:  I told Officer Wendel and her on the

3      radio that if there's any questions to contact

4      myself.

5  BY MR. CERCONE:

6  Q.  Did she ever ask anybody don't arrest him or do

7      anything improper?

8  A.  I don't know.  She never contacted me.

9  Q.  But you didn't become aware of that from any

10     source, correct?

11 A.  I don't know.  I didn't -- I just know that she

12     was -- she had spoken to Officer Wendel maybe or

13     Officer Krug.  I don't remember.  She spoke with

14     one of them I believe and she repeatedly kept

15     calling them on the radio at which point I

16     intervened.

17 Q.  When you say repeatedly, how many times were you

18     aware that she allegedly called just looking for

19     any of the officers that had arrested her son?

20 A.  At least -- I'm going to say I remember two,

21     maybe three.  And she had Officer Michael Eason

22     also intervening.

23 Q.  Again, from what you heard from any source, did

83

```
1        she ever ask anyone not to arrest them or do
2        anything improperly?
3    A.  I don't know what the conversation was.
4    Q.  So to your knowledge, no, correct?
5    A.  My knowledge is that she didn't -- when requested
6        to contact me, she did not.  And what her
7        conversation was with other people, I don't know.
8    Q.  And when she attempted to contact the officers
9        with the radio station, isn't it true that the
10       boys had already left the station and were on
11       route to the holding center?
12   A.  Like I said, I'm not sure if it was at the
13       station or en route to the holding center.  Like
14       I stated earlier, I wasn't sure when that took
15       place.
16   Q.  And Officer Eason, how did he contact you?
17   A.  He never contacted me either.  He also was
18       getting on the air trying to contact them I
19       believe.
20   Q.  Do you know Officer Eason?
21   A.  I know who he is.
22   Q.  Okay.  Did you ever have any problem with Officer
23       Eason?
```

```
1   A.   Officer Eason testified at the Cariol Horne
2        incident also and was untruthful in that
3        testimony also.
4   Q.   So you're saying Officer Eason perjured himself
5        under oath?
6   A.   It's proven on record that his comments were not
7        consistent with his testimony, that they were
8        inaccurate, yes.
9   Q.   My question to you was, so you're saying he
10       perjured himself under oath?
11  A.   I'm saying what he testified to originally to
12       what he testified to again were two completely
13       different contradictory statements is what I'm
14       saying.  Whether or not they constitute perjury,
15       I don't know.  I'm not a lawyer, I'm not a judge.
16       I'm just telling you the facts that are on record
17       of what transpired.
18  Q.   Well, you're telling me your opinion.  Did anyone
19       charge him with perjury?
20  A.   No.  Not to my knowledge.
21  Q.   Now, you said -- strike that.  Do you have any
22       knowledge that Officer Parker, Annette Parker,
23       called Officer Eason at all?
```

1   A.   No.

2   Q.   And, by the way, you said you had a history with

3       Officer Parker.  That was your testimony?

4   A.   Correct.

5   Q.   Okay.  What is that history that you were

6       referring to?

7   A.   Officer Parker represented Officer Cariol Horne

8       who was terminated from the job and represented

9       her through her disciplinary hearing which I was

10      the main witness in against Officer Cariol Horne.

11  Q.   Was she a union or officer rep for Cariol Horne?

12  A.   No.

13  MR. GENTILE:  Who is she, Annette Parker?

14  MR. CERCONE:  Yes.  That's what he said about the

15      history.

16  THE WITNESS:  Not as far as I know.

17  BY MR. CERCONE:

18  Q.   Well, she's not an attorney, correct?

19  A.   That's correct.  She offered -- she requested me

20      -- when Officer Horne dismissed her union

21      representation, she chose to have Officer Parker

22      represent her.

23  Q.   And that was in what type of procedure?

1  A.   Her disciplinary hearings for Officer Horne.

2  Q.   And were you accused of doing something to

3       Officer Horne in this proceeding that you say you

4       had a history with Miss Parker?

5  MR. GENTILE:  Object to the question because I don't

6       understand the question, but -- can you rephrase

7       that.  I don't understand that.

8  BY MR. CERCONE:

9  Q.   Okay.  You're saying you have a history with Ms.

10      Parker.  The fact that she questions you, is that

11      a problem?

12 A.   No.  The problem is that the case became a

13      blown-out media circus and there were a lot of

14      unsubstantiated claims made, which in the long

15      run I was -- which, to answer your question, I

16      was a witness for the City of Buffalo against

17      Officer Cariol Horne.  I was the main witness

18      against Officer Cariol Horne.  It was a

19      month-long trial that dragged out, or month-long

20      hearing that they wanted open to the media.  It

21      became a complete media circus.  Officer Parker

22      was part of her defense team, and in the long

23      story short, Officer Cariol Horne was terminated

1    from the Buffalo Police Department based on those

2    charges.

3  Q.  And Officer Parker just simply asked you

4    questions at this hearing, correct?

5  A.  And then also represented her, Cariol Horne,

6    throughout the rest of the procedures.

7  Q.  So she represented her, so you're saying that's

8    the history the two of you have?

9  A.  Yes.

10  Q.  Were you ever charged with anything?

11  MR. GENTILE:  What do you mean, in criminal court?

12  MR. CERCONE:  No, in these proceedings.

13  MR. GENTILE:  What proceedings?

14  MR. CERCONE:  The one he's talking about that he

15    testified at with Miss Annette Parker.

16  MR. GENTILE:  He said it was Cariol Horne's

17    proceeding.

18  MR. CERCONE:  I'm asking was there any proceeding.

19  MR. GENTILE:  Was he charged in that proceeding?

20  BY MR. CERCONE:

21  Q.  As it pertained to the incidents with Cariol

22    Horne, were you ever charged with anything?

23  MR. GENTILE:  I'm going to ask him not to answer

1       that.  It involved a dismissal proceeding

2       involving the Defendant in this matter.

3  BY MR. CERCONE:

4  Q.  Officer Parker -- you said you had a history.

5       Was Officer Parker ever involved in any other

6       proceeding?

7  A.  No.  But if I may clarify something, she also

8       went on a radio program, spoke at length about

9       me, various derogatory remarks against me on a

10      radio program.  So, yes, when I say there's a

11      history, it is a personal history that I have.

12      She's been quoted in newspapers and on radio

13      programs that she's speaking against me in

14      unflattering terms and unsubstantiated claims.

15  Q.  Well, you claim she spoke in the newspapers,

16      correct?

17  A.  And the --

18  Q.  Is that what you just said?

19  MR. GENTILE:  I'm sorry.  When you say he, she, could

20      you please -- there's a Miss Horne, Miss Parker.

21      Who are you asking the question about?

22  BY MR. CERCONE:

23  Q.  Okay.  He just answered a question, so I was

1       asking this question.

2            You said Officer Parker spoke in the

3       newspaper about you, correct?

4  A.   Can I clarify?

5  Q.   I'm asking if that's what you said, and if you

6       need to clarify, go ahead.

7  MR. GENTILE:  Was it Officer Parker or Horne?  I'm

8       getting confused.

9  THE WITNESS:  It was Officer Parker and Officer

10      Horne, but Officer Parker -- and the newspapers

11      that I'm referring to are not The Buffalo News.

12      They are local African America newspapers, The

13      Challenger.  The Criterion I believe is another

14      name.  And those type of papers.  Not The Buffalo

15      News or a regional paper.

16  BY MR. CERCONE:

17  Q.   And what quotes are you claiming are attributable

18      to Annette Parker about you in these newspapers?

19  A.   That I am a perjurer and I'm a liar.  Without

20      looking at them and refreshing since it's been a

21      while, I really couldn't tell you.  They were

22      personal attacks against me.

23  Q.   And anything else that you recall?

1   A.   I -- like I said, without looking at them or

2        referring to any documents, I really can't

3        recall.

4   Q.   And you said she went on a radio station as well?

5   A.   Correct.

6   Q.   What radio station?

7   A.   It was the Ted Kirkland show.  Whatever station

8        that's on.

9   Q.   And did you listen to it?

10  A.   Yes.

11  Q.   And what statements are you claiming she said on

12       the radio station as it pertained to you?

13  A.   The facts, the way she was portraying the Cariol

14       Horne incident was untrue, and also stating that

15       myself and other -- every other witness there had

16       perjured themselves and lied throughout that

17       hearing.  Which was held in a public setting and

18       in front of a hearing officer who determined that

19       not to be the case and dismissed Cariol Horne.

20  Q.   Who was the hearing officer?

21  A.   Renaldo I believe was his name.

22  MR. GENTILE:  It's been an hour.

23            (Whereupon, a short recess was then taken.)

```
 1   BY MR. CERCONE:

 2   Q.   By the way, sir, do you remember what time this

 3        incident allegedly happened whereby you were

 4        called to the scene on Treehaven?

 5   A.   No.  It was late.  Late that night or early in

 6        the morning.  I'm not sure.

 7   Q.   And you said you spent a couple hours at the

 8        station, E District, correct?

 9   A.   I'm going to guess somewhere around there.

10   Q.   That's your best estimate, correct?

11   A.   Yes.

12   Q.   And then from there they were taken to

13        headquarters or the holding center?

14   A.   I believe the holding center.

15   Q.   By the way, sir, after this incident occurred,

16        was there ever an edict issued by the

17        commissioner saying that suspects should no

18        longer be brought back to the precincts?

19   A.   Yes, there was; without the permission of the

20        duty officer.

21   Q.   And who was the duty officer?

22   MR. GENTILE:  What do you mean?  What frame of time?

23   BY MR. CERCONE:
```

1    Q.   Okay.   The duty officer is who?

2    A.   He would be the most-senior person working that

3         night.  Most of the time it's an inspector.

4         Sometimes a captain.

5    Q.   Do you know if it was in -- strike that.  Is it

6         your testimony -- other than what you said

7         already about pushing someone's head down onto

8         the hood of the car in the manner that you

9         described, is it your testimony that you did not

10        hit or strike any of the other four suspects?

11   A.   Correct.

12   Q.   Do you know if anyone shot any of these suspects?

13   A.   No.

14   Q.   Did you ever hear any discussion that the

15        officers thought it was a joke to shoot Mr.

16        Silmon with his own BB gun?

17   A.   I didn't become aware of that until a year later

18        when I saw it on TV.

19   Q.   And how did you see it on TV?

20   A.   You had a press conference.

21   Q.   I had a press conference?

22   A.   You were on TV or something.  That's how I found

23        out about the lawsuit was filed and that was an

1    allegation.

2 Q.  And I was on TV doing a press conference about

3    this?

4 A.  I don't know if it was a press conference.  I saw

5    you on TV though.  That's how I first found out

6    about this lawsuit.  It was on Channel 4 a year

7    later.

8 Q.  And that's the first you ever heard about it?

9 A.  Yes.

10 Q.  So when -- strike that.  Do you know if a Notice

11    of Claim was filed within ninety days after this

12    incident occurred?

13 MR. GENTILE:  Object to legal questions.  It's not

14    factual.

15 MR. CERCONE:  Yes, it is factual, number one.  And

16    number two, I'm asking if he knows.  That's a

17    factual question.

18 BY MR. CERCONE:

19 Q.  Do you know if a Notice --

20 A.  No.

21 Q.  So the first you claim you heard of it was me

22    doing a press conference on TV?

23 A.  I don't know what it was.  I saw you on TV

1       talking about it.  That's the first time I ever

2       heard any of these allegations whatsoever.

3   Q.  And after hearing about the allegations, what, if

4       anything, did you do?

5   A.  When I first heard it?

6   Q.  Yes.

7   A.  I laughed.

8   Q.  Okay.  And after you got done laughing, what did

9       you do?

10  MR. GENTILE:  Form.  You can answer.

11  THE WITNESS:  I think I might have called up Ray or

12      Joe and asked if they saw it on TV.

13  BY MR. CERCONE:

14  Q.  And what did they say?

15  A.  I don't know if they said they saw it or someone

16      had called them and said they had seen it.

17  Q.  And did you ask anybody about whether one of

18      these four young boys was shot with a BB gun?

19  A.  Did I ask who?

20  Q.  Officer Krug.

21  A.  No.

22  Q.  Did you ask Officer Wendel?

23  A.  No.

1   Q.   Why not?

2   A.   It was ridiculous.

3   Q.   It's ridiculous that they would have got shot?

4   A.   Yes.

5   Q.   In fact, that would be absolutely contrary, not

6        only to police procedure, but it would be

7        ridiculous for a police officer to do that,

8        correct?

9   A.   Yes.

10  Q.   Especially if he was doing it just for fun,

11       correct?

12  A.   To do it period.

13  Q.   And again, you don't know of any incidents with

14       these boys where there was any allegations that

15       these boys were shot by anybody, correct?

16  A.   Correct.   Except for what was said in these

17       paperwork.

18  Q.   What are you talking about now?

19  A.   The paperwork that you filed.

20  MR. GENTILE:   The legal paperwork, your summons and

21       complaint.

22  BY MR. CERCONE:

23  Q.   Okay.   Other than the summons and complaint, you

1     don't know of any allegations from any source

2     that these boys were allegedly shot at, correct?

3  A.  Correct.

4  Q.  When did you become aware that the lawsuit was

5     filed?

6  A.  Like I said, the only time I remember is when it

7     was on TV.

8  Q.  When were you first contacted regarding this

9     lawsuit?

10  A.  I don't recall.

11  Q.  Did you ever have discussions with any attorneys

12     regarding this lawsuit?

13  MR. GENTILE:  You can answer yes, no.

14  THE WITNESS:  Yes.

15  BY MR. CERCONE:

16  Q.  Did you ever discuss this with Andrew Fleming?

17  A.  Yes.

18  Q.  When is the first time you saw the legal papers?

19  A.  I want to say the first time I actually saw the

20     papers was -- the complete papers was a couple

21     weeks ago when we met at that attorney's office.

22     Other than that, I remember receiving like a very

23     vague, generic one-page copy of something that

1      was in my mailbox at work I believe or something.

2      But other than that, the first time I ever saw

3      the actual paperwork with any, you know,

4      allegations or documentation to it was from

5      Carmen that day a couple weeks ago when we met at

6      that other attorney's office.

7  Q.  And so it's your testimony that these boys --

8      neither of these boys was shot with any BB gun

9      back on May 30th or 31st, correct?

10  A.  Absolutely no.

11  Q.  And if Officers Wendel or Krug did it, they

12      didn't do it with your permission?

13  MR. GENTILE:   Form.

14  THE WITNESS:   For one --

15  MR. GENTILE:   He said he didn't know of any police

16      officer shooting them.

17  BY MR. CERCONE:

18  Q.  I'm saying if Officers Wendel and Krug did it,

19      that would not have been with your permission?

20  A.  Absolutely not.  For one, if I would have known

21      something like that took place, there would have

22      been disciplinary action taken right then and

23      there.  But to answer your question, it's still

1    no.

2  BY MR. CERCONE:

3  Q.  With regard to this lawsuit, once it was filed

4      did you ever have to give a statement to the

5      police department in the regular course of

6      business?

7  A.  An internal affairs statement, yes.

8  Q.  And that was in regards to this lawsuit being

9      filed, correct?

10  A.  No.  They had an investigation opened.

11  MR. CERCONE:  Again, I will make a request for that.

12  BY MR. CERCONE:

13  Q.  Did Officers Krug and Wendel have to as well to

14      your knowledge?

15  MR. GENTILE:  Object to any questions regarding an

16      internal investigation.

17  BY MR. CERCONE:

18  Q.  Did Officers Krug and Wendel testify, to your

19      knowledge, as well?

20  MR. GENTILE:  I object and I'm instructing him not to

21      answer.

22  MR. CERCONE:  I'll make a request for those

23      statements.

1   MR. GENTILE:  I have to deny them at this point.

2       You're going to have to move the Court.  For

3       anything relating to personnel or disciplinary

4       files, you're going to have to get a court order.

5   MR. CERCONE:  I'm not only going to move the Court,

6       but I also need to question them on the

7       statements, so --

8   MR. GENTILE:  You can do that.  You can reserve the

9       right to recall.

10  MR. CERCONE:  I am.  I'm reserve my rights, that's

11      what I'm saying.

12  MR. GENTILE:  And once you -- if the Court by court

13      order allows any disciplinary information.

14  BY MR. CERCONE:

15  Q.  After you claim Cariol Horne went on the radio

16      and said things that your testimony was untrue or

17      was false, did you ever have any conversations

18      with her after that?

19  A.  I believe what I started earlier was Officer

20      Parker.

21  Q.  If I said Cariol Horne, I apologize.  After you

22      said Annette Parker went on the radio and said

23      your testimony was untrue and false, did you ever

1      have any conversations with Officer Parker after

2      that.

3   A. No.

4   Q. Did she ever talk to you after that?

5   A. I believe maybe the only contact we had was at an

6      accident scene.  That was it.

7   Q. And was the content of the conversation

8      professional and courteous at the accident scene?

9   A. Yes.

10  Q. What did you do with the BB gun that the

11     Cheektowaga police officer gave you?

12  A. I don't recall if I handed it to Ray or Joe or if

13     I put it down and they got it.  Either way, I

14     think they ended up turning it in.  One of them.

15  Q. And if they turned it in, they would have had to

16     fill out some type of work form, is that correct?

17  A. Yes.

18  Q. What's the form called?

19  A. Property report.

20  Q. What's the letter assigned to it?

21  A. P dash 10.

22  Q. And in addition to the P dash 10 form, they would

23     have had to log in with the evidence clerk, is

1      that correct?

2   A.  After hours, yeah, they just would log -- there

3       is no one working at that time.  It would be a

4       log-in into a book.

5   Q.  They have to keep a chain of custody over that

6       type of evidence, correct?

7   A.  Yeah.

8   Q.  A record of a chain of custody, is that correct?

9   A.  Um-hum.  Yes.

10  Q.  The gun itself, did Cheektowaga tell you it was

11      under the seat and you retrieved it or did they

12      physically hand you the gun?

13  A.  I don't remember.  I just remember it was on the

14      floor of the front seat.

15  Q.  I'm sorry.  What was that?

16  A.  I just remember it was on the floor of the

17      passenger front seat.  I don't recall if he

18      handed it to me or if I picked it up.

19  Q.  How do you remember it was on the floor of the

20      front passenger's seat?

21  A.  'Cause I recall him stating to me that that's

22      where it was.  The, the Cheektowaga officer.

23  Q.  As opposed to you seeing it there?

1    A.   Yes.   He did point it out to me.

2    Q.   Okay.   So did you see it there?

3    A.   That's where he pointed out.   Whether it was he

4         gave it to me or I picked it up off the floor, I

5         don't remember.

6    Q.   Okay.   But my point is, when he pointed it out to

7         you, you did see it on the floor of the front

8         passenger's seat?

9    A.   Yes.

10   MR. CERCONE:   Carmen, that's all I have for now.

11   MR. GENTILE:   Okay.   No questions.

12

13                        *     *     *     *     *

14

15

16

17

18

19

20

21

22

23

1      STATE OF NEW YORK)

2                        SS:

3      COUNTY OF ERIE)

4

5          I, Carla M. Glinski, a Notary Public in and

6      for the State of New York, County of Erie, DO

7      HEREBY CERTIFY that the testimony of GREGORY

8      KWIATKOWSKI was taken down by me in a verbatim

9      manner by means of Machine Shorthand, on July 6,

10     2011.  That the testimony was then reduced into

11     writing under my direction.  That the testimony

12     was taken to be used in the above-entitled

13     action.  That the said deponent, before

14     examination, was duly sworn by me to testify to

15     the truth, the whole truth and nothing but the

16     truth, relative to said action.

17         I further CERTIFY that the above-described

18     transcript constitutes a true and accurate and

19     complete transcript of the testimony.

20

21     _____

22                    CARLA M. GLINSKI,
                       Notary Public.

23

**-'-**

'11 [1]   19:10
'cause [1]   13:8
26:1   101:21

**-1-**

10 [2]   100:21   100:22
1126 [1] 2:6
11th [1] 4:7
14202 [2]   2:3
2:6
1964 [1] 4:7
1983 [3] 37:19   37:20
38:4
1987 [1] 38:17
1990 [4] 38:3   38:4
38:18   39:9

**-2-**

2000 [1] 40:17
2008 [1] 39:13
2009 [4] 4:16   34:23
40:18   51:14
2011 [6] 5:15   5:16
20:20   39:19   40:6
103:10
26th [2] 5:15   5:16
2767 [1] 2:22

**-3-**

30th [2] 40:18   97:9
31st [4] 4:16   34:23
51:14   97:9

**-4-**

4 [1]   93:6
484 [1] 2:2

**-5-**

50 [2]   6:6   35:7

**-6-**

6 [1]   103:9

**-7-**

710.30 [5]   44:14
45:13   46:13   46:16
47:1
710.30's [1]   45:8

**-A-**

a.m [1]   40:23
above-described [1]
103:17
above-entitled [1]
103:12
absolutely [3]   95:5
97:10   97:20

accept [2]   3:8
3:16   3:22
access [1]   43:15
accident [2]   100:6
100:8
accomplice [1] 45:8
accomplices [1]
46:6
according [2]   57:19
78:11
accurate [2]   50:6
103:18
accused [9]   6:13
6:15   23:1   23:5
35:16   36:5   36:10
36:16   86:2
act [1]   79:9
acted [1]   72:11
action [3]   97:22
103:13   103:16
acts [3]   6:20   6:21
7:1
actual [1]   97:3
addition [5]   72:22
73:13   73:15   80:23
100:22
address [7]   3:6
3:19   42:8   47:13
47:14   47:16   48:2
admit [2]   45:4
45:6
admitted [1]   46:6
adversarial [1] 23:9
advise [1]   11:8
advised [2]   11:8
78:5
affairs [3]   11:14
18:15   98:7
African [1]   89:12
again [6]   4:12
43:17   82:23   84:12
95:13   98:11
against [8]   14:12
22:15   85:10   86:16
86:18   88:9   88:13
89:22
ago [2]   96:21   97:5
agree [2] 3:14   52:14
ahead [2]   54:5
89:6
air [2]   81:17   83:18
alcohol [4]   30:7
30:13   36:18   64:10
allegation [2]   8:17
93:1
allegations [14] 7:6
9:3   12:11   24:17
27:4   29:10   44:7
72:3   80:2   94:2
94:3   95:14   96:1
97:4
allege [1]   9:14
60:6
alleged [15]   7:20
8:8   11:11   12:23

25:11   43:2   44:2
44:4   46:20   51:18
65:21   65:22   65:23
70:9   75:12
allegedly [17]   4:15
7:7   8:18   13:16
16:9   23:20   41:8
64:6   65:11   65:19
66:4   66:5   68:12
72:3   82:18   91:3
96:2
allowed [2]   6:20
6:23
allows [1]   99:13
Along [1]   55:13
Alongside [1]   48:8
always [4]   74:7
74:8
America [1]   89:12
amount [1]   42:20
Andrew [1]   96:16
Annette [5]
84:22   85:13   87:15
89:18   99:22
answer [20]   5:5
7:3   8:2   8:22
11:16   12:2   13:2
22:6   22:11   35:2
45:14   57:4   67:3
69:5   86:15   87:23
94:10   96:13   97:23
98:21
answered [1]   21:17
45:11   88:23
apologize [1]   99:21
APPEARANCES [1]
2:1
Appearing [2]   2:3
2:7
appointed [1]   39:21
apprehend [1]   42:19
approximately [1]
12:11   15:20
area [2]   24:10   37:9
argumentative [4]
57:3   57:6   57:10
57:14
Armed [1]   38:12
arrest [17]   41:4
53:23   54:3   55:9
58:2   58:6   58:7
58:9   58:17   60:7
61:10   61:11   75:17
75:18   81:15   82:6
83:1
arrested [3]   74:3
77:14   82:19
arresting [3]   53:4
55:6   70:10
arrests [2]   55:3
55:3
arrived [5]   49:3
50:3   77:4   77:12
78:1
article [7]   7:19
8:3   8:7   8:11

8:13   9:14   35:21
assault [2]   55:7
55:7
assaulted [4]   7:21
8:19   9:15   35:22
assaulting [4]   6:15
35:16   36:5   36:11
assigned [4]   19:22
39:23   40:2   100:20
assignment [1] 40:1
assist [1]   49:23
assistant [2]   2:5
46:4
assume [1]   66:10
attacks [1]   89:22
attempted [1]   83:8
attend [2]   36:22
37:13
attended [1]   36:23
attention [1]   23:21
attorney [4]   3:15
46:4   46:10   85:18
attorney's [2]   96:21
97:6
attorneys [1]   96:11
attributable [1] 89:17
August [1]   4:7
authority [2]   3:8
61:5
authorized [1]   42:18
authorizing [2]   3:15
3:21
Avenue [3]   2:2
2:22   24:9
awards [2]   25:22
38:13
aware [16]   8:3
23:18   27:4   29:6
29:10   41:6   41:7
47:9   69:17   72:10
76:16   78:2   82:9
82:18   92:17   96:4
away [7] 31:6   32:12
32:15   62:12   67:10
67:17   75:13

**-B-**

back [32]   13:4
13:9   17:23   18:5
18:8   34:19   40:18
42:10   51:14   57:13
58:8   59:12   61:8
62:1   62:18   63:4
63:7   65:5   66:19
67:6   67:15   67:18
67:23   68:3   69:4
69:7   69:8   69:9
72:16   74:4   91:18
97:9
bad [5]   6:20   6:21
6:23   14:1   14:6
badge [1]   32:4
Bailey [4]   2:22
24:9   25:13   47:19
banquet [1]   25:22

bar [4]   28:23   35:17
35:22   36:6
Bar/restaurant [1]
29:1
based [1]   87:1
BB [13]   41:5   41:9
44:6   69:19   69:22
70:1   70:4   70:9
70:18   92:16   94:18
97:8   100:10
became [4]   19:19
78:2   86:12   86:21
become [1]   41:6
47:20   47:21   82:9
92:17   96:4
becomes [1]   47:23
beer [5]   29:7   29:12
29:14   29:14   36:16
began [1]   50:23
52:19
behalf [2]   3:9
3:16
behave [1]   56:14
behind [7]   42:5
52:8   59:12   61:7
62:1   63:4   67:5
belligerent [5]   54:9
54:13   57:3   75:4
75:8   76:5
benefit [1]   28:14
28:15
best [2]   74:11   91:10
between [3]   2:14
18:17   38:4
beyond [1]   37:21
Bill [1]   34:19
Billy [1] 28:16
birth [1] 4:5
Bishop [1]   37:14
bit [2]   5:1   42:3
bleeding [1]   33:2
Blood [1]   37:4
blown-out [1]   86:13
blurring [1]   65:15
body [1] 68:3
book [2] 78:12   101:4
Boxwood [1]   39:2
39:3
boys [17]   22:20
44:3   47:11   51:18
63:6   63:6   79:9
79:19   80:5   80:9
83:10   94:18   95:14
95:15   96:2   97:7
97:8
briefing [1]   25:2
briefly [1]   4:12
bring [1]   77:8
brought [4]   22:14
79:3   79:6   91:18
Buffalo [35]   2:3
2:4   2:21   2:23
3:22   4:9   5:10
5:13   6:8   6:22

**dash** [4]  6:6    35:7
100:21  100:22
**date** [2]  4:5    7:14
**days** [2]  17:11    93:11
**dead** [1]  3:23
**dealt** [2] 64:16    64:17
**decorum** [1]    56:15
**deems** [1]    6:10
**Defendant** [1]    88:2
**defendants** [4]  2:7
49:18   49:19   78:14
**defense** [1]    86:22
**Delacey** [3]    25:22
28:20   30:12
**Delaware** [1]  2:2
**demeanor** [4]    69:11
69:16   75:11   76:2
**deny** [1] 99:1
**department** [17]2:4
4:10    5:11    5:14
6:8    6:14    6:23
11:11   32:21   35:9
38:2    38:8    38:19
39:8    43:14   87:1
98:5
**deponent** [1]    103:13
**deposition** [1]  57:8
**derogatory** [1]  88:9
**describe** [3]    57:10
68:2    68:6
**described** [2]    18:20
92:9
**description** [2] 41:10
72:7
**descriptions** [1]
43:5
**detail** [1]    42:17
**detective** [10]    44:10
44:15   44:16   44:19
44:20   44:23   45:2
77:1    80:7    80:22
**determined** [1] 90:18
**different** [3]    74:10
77:9    84:13
**dinner** [1]    25:22
**direction** [3]    48:12
62:21   103:11
**disagree** [3]    35:9
52:11   52:14
**discharge** [1]    38:9
**disciplinary** [9]
11:3    11:5    22:10
35:2    85:9    86:1
97:22   99:3    99:13
**disciplined** [1] 34:22
**disclosed** [1]    35:5
**discourse** [1]    57:7
**discuss** [1]    96:16
**discussion** [7]  3:5
9:20    10:2    10:7
10:17   18:14   92:14
**discussions** [1] 96:11
**dismissal** [1]    88:1

**dismissed** [2]    85:20
90:19
**disorderly** [8]    54:12
54:16   54:18   54:23
55:8    55:18   55:22
57:18
**disparaging** [1] 16:10
**dispatch** [1]    74:1
**district** [16]    2:22
24:5    36:17   39:20
39:23   40:3    40:5
40:8    40:11   40:14
42:6    42:10   46:4
46:9    73:8    91:8
**disturbance** [2] 32:19
56:8
**disturbed** [1]    56:10
**documentation** [1]
97:4
**documents** [1]    90:2
**doesn't** [3]    3:6
17:9    17:14
**Donald** [1]    2:9
**done** [4] 71:12    78:10
78:11   94:8
**door** [2]  78:23    79:6
**dotted** [1]    78:10
**down** [13]    13:4
13:9    44:13   45:7
45:13   46:8    47:1
67:23   71:16   80:11
92:7    100:13  103:8
**dragged** [1]    86:19
**drinking** [1]    30:7
30:12   64:3
**drive** [1] 42:8
**driveway** [3]    51:19
51:21   52:9
**driving** [1]    50:13
**drop** [1] 3:23
**dropped** [1]    32:1
**drove** [1]    72:16
**drugs** [1]    64:13
**due** [5]    35:5    36:23
40:16   42:19   77:2
**duly** [2] 3:1    103:14
**dump** [1]    22:21
**dumped** [1]    25:13
**during** [1]    80:19
**duty** [4] 81:13   91:20
91:21   92:1

-E-

**E** [15]    2:9    2:21
2:22    19:11   24:5
36:17   39:22   39:23
40:3    42:6    42:10
43:13   74:7    74:12
91:8
**early** [4] 4:15    36:1
91:5
**Eason** [7]    82:21
83:16   83:20   83:23
84:1    84:4    84:23

**east** [1]    37:6
**edict** [1] 91:16
**education** [1]    37:21
**effect** [1]    29:10
**Eggert** [1]    47:21
**eight** [7] 8:15    8:16
10:12   12:12   12:23
20:20   40:23
**Eighteen** [1]    39:12
**either** [6]    24:18
46:13   68:8    77:17
83:17   100:13
**eligible** [1]    5:18
**employed** [1]  4:8
**en** [1]    83:13
**end** [5]    32:7    32:11
32:13   32:17   32:18
**ended** [1]    100:14
**engage** [1]    57:6
**enter** [1] 22:3
**entered** [1]    2:12
**entitled** [1]    14:20
**entrance** [3]    77:9
77:9    78:21
**Erie** [2]  103:3    103:6
**especially** [3]  73:6
73:10   95:10
**ESQ** [2]  2:2    2:5
**estimate** [1]    91:10
**everybody** [1]  79:5
**everything's** [1]
78:11
**evidence** [1]    43:1
100:23  101:6
**exactly** [8]    8:19
45:2    50:9    69:14
70:22   75:10   76:1
76:1
**examination** [2]
4:3    103:14
**except** [2]    2:18
95:16
**excessive** [1]   34:22
**excuse** [3]    40:10
44:23   47:20
**expeditionary** [1]
38:12

-F-

**face** [11] 26:11    27:5
59:3    60:15   60:17
60:18   61:2    67:8
67:19   67:21   67:22
**faces** [1] 50:16
**facing** [1]    48:12
50:16   51:21
**fact** [4]  64:10    79:14
86:10   95:5
**facts** [1] 84:16    90:13
**factual** [1]    93:14
93:15   93:17
**factually** [2]    59:8
75:21

**fair** [1]  52:12
**false** [2] 99:17    99:23
**familiar** [1]    37:21
**far** [4]    51:15   62:16
62:17   85:16
**fashion** [1]    13:16
50:14   53:21   58:10
60:7    75:18   79:12
**favor** [1]    54:4
54:15
**federal** [1]    22:15
**fellow** [5]    5:21
7:21    8:20    33:16
58:2
**felonies** [2]    54:20
55:1
**felt** [1]   16:9
**fight** [1] 53:20
**fighting** [1]    33:19
**file** [1]  43:12
**filed** [6] 92:23    93:11
95:19   96:5    98:3
98:9
**files** [1] 99:4
**filing** [1]    2:16
**fill** [1]  100:16
**Fillmore** [1]    37:16
**fine** [4]  3:7    4:1
35:11   46:9
**finish** [3]    66:1
71:11   71:14
**first** [33] 31:9    39:21
48:22   49:2    50:21
51:1    52:2    53:8
53:17   55:8    56:13
60:15   60:17   64:16
65:3    65:11   66:9
66:16   68:11   69:6
69:16   72:12   75:16
76:19   93:5    93:8
93:21   94:1    94:5
96:8    96:18   96:19
97:2
**five** [4]  74:7    74:7
74:12   74:12
**flee** [3]  62:4    62:6
75:13
**Fleming** [1]    96:16
**floor** [10]    70:1
70:2    70:20   70:20
70:21   101:14  101:16
101:19  102:4   102:7
**following** [1]    2:12
**follows** [1]    3:2
**force** [2] 34:22    68:9
**Forces** [1]    38:12
**form** [115]    2:18
7:22    8:22    9:5
9:17    9:22    10:4
10:10   10:13   10:18
10:20   12:10   12:13
12:20   13:2    13:7
13:12   13:18   14:2
14:8    14:13   14:16
14:22   15:6    15:10
15:16   15:19   16:1

16:6    16:11   16:18
16:21   17:6    17:16
18:1    18:9    19:2
19:7    19:12   19:16
19:21   20:4    20:8
20:13   21:1    22:5
23:2    23:7    23:13
23:16   23:22   24:7
24:14   24:19   25:1
25:8    25:15   25:23
26:12   26:17   26:20
27:1    27:2    27:6
27:11   27:16   27:21
29:8    29:11   29:16
29:22   30:4    30:8
30:14   30:19   31:5
31:11   31:16   31:20
32:2    32:8    32:14
32:22   33:6    33:11
33:17   33:23   34:5
34:9    34:13   34:18
35:18   36:2    36:8
36:12   36:19   42:16
43:4    45:10   45:15
52:13   54:5    54:17
55:17   55:23   57:21
66:2    66:23   73:22
82:1    94:10   97:13
100:16  100:18  100:22
**former** [2]    46:4
56:6
**forty** [1] 33:19
**forward** [1]    68:3
**found** [7]    53:1
69:22   72:9    73:18
74:1    92:22   93:5
**four** [10] 38:5    49:20
63:6    64:23   75:5
75:7    76:6    80:2
92:10   94:18
**four-door** [1]    68:18
**fourteen** [1]    15:20
**frame** [1]    8:6
8:9    91:22
**Fred** [2]  40:4    40:5
**friend** [1]    28:1
28:3
**front** [8] 69:4    70:20
70:21   90:18   101:14
101:17  101:20  102:7
**fuck** [1]  56:11
**fucking** [1]    54:8
55:12   55:15   58:6
**fun** [1]   95:10
**funny** [1]    56:14

-G-

**G** [2]    2:21    2:21
**gang** [3] 22:21    24:9
25:13
**gang's** [2]    22:22
25:14
**garage** [2]    79:1
79:4
**generic** [1]    96:23
**Gentile** [155]    2:5
3:12    3:15    3:21

50:7
late [2] 91:5  91:5
laughed [1]  94:7
laughing [1]  56:12
94:8
law [4]  2:4  6:6
35:6  57:19
lawsuit [7]  92:23
93:6  96:4  96:9
96:12  98:3  98:8
lawyer [1]  84:15
leaned [3]  53:19
59:16  60:20
least [5] 5:1  42:13
63:19  67:23  82:20
leave [1] 53:17
leaving [1]  35:23
left [7]  48:3  48:4
53:10  76:19  76:21
80:12  83:10
legal [4] 56:15  93:13
95:20  96:18
length [1]  88:8
letter [2] 78:12  100:20
liar [1]  89:19
lied [1]  90:16
lieutenant [8]  4:9
39:17  39:18  39:21
40:1  73:4  80:22
81:18
lieutenants [1]  73:7
lifted [4]  59:14
61:1  67:8  67:22
lifting [1]  59:2
59:4  61:4
light [2] 14:1  14:6
liked [1] 76:14
line [1]  65:15
lines [1]  55:14
listen [1]  90:9
living [1]  37:15
local [1] 89:12
located [1]  39:1
location [1]  49:17
log [2]  100:23  101:2
log-in [1]  101:4
longer [1]  91:18
look [3] 60:4  61:18
66:21
looked [2]  58:8
61:8
looking [4]  81:9
82:18  89:20  90:1
lose [1]  62:23

-M-

M [3]  2:2  103:5
103:21
Machine [1]  103:9
mailbox [1]  97:1
main [6] 41:17  41:18
42:1  81:12  85:10

86:17
man [1]  36:11
manner [10]  12:22
13:9  13:11  14:7
17:20  26:19  60:17
68:2  92:8  103:9
marine [4]  38:5
38:10  38:11  38:17
marked [2]  41:22
48:20
marks [1]  79:19
Mary [1]  2:8
mass [1] 42:20
matter [1]  88:2
matters [1]  6:4
may [11] 4:16  10:8
34:23  40:18  45:17
51:14  64:22  71:6
74:10  74:18  97:9
McAndrew [13] 9:13
9:21  11:1  12:10
16:9  18:17  18:23
19:4  19:6  32:23
33:4  33:9  34:20
mean [17]  11:5
14:20  20:18  28:4
53:9  56:4  57:13
59:2  59:6  62:3
63:15  73:11  75:7
80:15  80:22  87:11
91:22
Meaning [1]  18:13
means [3]  66:21
67:1  103:9
meant [1]  61:20
medals [1]  38:12
media [3]  86:13
86:20  86:21
meeting [1]  18:14
member [1]  32:20
members [3]  24:9
27:14  30:1
men [2]  42:4  43:2
mentioned [1]  44:11
messed [1]  3:13
met [5]  4:11  41:1
51:12  96:21  97:5
method [1]  43:6
Michael [1]  82:21
middle [1]  20:7
might [5]  16:9
28:16  50:7  53:10
94:11
military [1]  5:17
mine [1] 64:22
Miranda [1]  47:5
Miss [4] 86:4  87:15
88:20  88:20
month-long [2] 86:19
86:19
months [5]  8:15
8:16  12:12  12:12
12:23
moral [1]  6:21

morning [1]  4:16
91:6
Most [1] 92:3
most-senior [1] 92:2
motion [1]  35:8
motions [1]  35:14
move [3]  6:10
99:2  99:5
moved [1]  39:4
moving [1]  60:13
must [1] 43:22

-N-

name [9]  9:10
9:11  26:6  26:7
31:1  31:3  32:9
89:14  90:21
natural [1]  56:18
necessary [1]  6:11
need [3] 11:7  89:6
99:6
needs [1]  11:8
neither [1]  97:8
never [11]  10:21
11:1  12:9  26:23
32:1  32:19  45:21
54:23  55:7  82:8
83:17
New [7] 2:3  2:6
2:23  6:5  35:6
103:1  103:6
News [3]  8:18
89:11  89:15
newspaper [11] 7:6
7:20  8:3  9:4
9:10  9:11  9:14
23:1  35:22  36:10
89:3
newspapers [5] 88:12
88:15  89:10  89:12
89:18
next [3] 36:17  42:3
64:17
NFTA [1]  30:11
night [7] 44:5  44:7
74:6  74:10  74:11
91:5  92:3
nine [5] 8:15  8:16
10:12  12:12  12:23
nine-month [1] 20:20
ninety [1]  93:11
nobody [3]  20:7
25:6  66:17
normal [4]  11:3
11:5  48:16  57:8
Notary [1]  103:5
103:22
note [1]  53:3
nothing [1]  68:7
103:15
notice [1]  79:19
93:10  93:19
now [13] 19:6  39:2
42:23  43:21  47:13

55:10  57:9  58:14
64:16  66:9  84:21
95:18  102:10
number [4]  41:11
74:8  93:15  93:16
numbers [1]  74:6
numerous [1]  57:23

-O-

O [2]  2:21  2:21
oath [6]  2:15  12:8
14:21  14:23  84:5
84:10
object [34]  7:22
8:22  11:16  12:13
13:2  14:2  14:8
14:13  14:16  14:22
15:6  15:10  15:16
15:19  16:1  22:5
24:7  25:8  25:15
29:8  30:14  35:1
36:8  36:19  43:4
45:10  45:15  54:5
55:23  66:2  86:5
93:13  98:15  98:20
objections [1]  2:18
obscene [1]  55:8
obviously [1]  78:7
occasions [1]  57:23
occur [2]  12:16
28:21
occurred [9]  4:15
7:5  8:8  12:11
25:11  29:20  51:14
91:15  93:12
occurrence [1] 74:9
occurring [1]  56:23
off [24]  3:5  54:6
54:7  54:10  58:12
58:16  58:18  58:20
58:22  59:1  59:2
59:3  59:4  60:8
61:12  61:14  61:20
61:22  66:18  66:21
67:2  67:9  76:3
102:4
offenses [1]  43:3
offered [1]  85:19
office [3]  24:3
96:21  97:6
officer [119]  5:21
6:16  7:7  7:21
8:21  9:9  9:12
9:20  11:1  11:6
12:9  15:23  16:4
16:8  18:17  18:22
19:4  19:6  24:18
24:18  25:21  26:6
27:20  27:20  27:22
27:22  28:1  28:9
28:17  28:20  30:5
30:22  32:5  32:23
33:4  33:9  33:16
33:22  34:3  34:7
34:19  46:17  48:22
49:12  49:16  49:23
52:4  53:4  56:5

57:12  63:8  63:11
69:21  70:14  70:19
72:22  72:22  73:16
74:18  76:10  77:5
77:5  77:7  77:13
77:15  78:5  78:7
79:3  79:7  81:2
81:5  81:5  81:11
81:19  82:2  82:12
82:13  82:21  83:16
83:20  83:22  84:1
84:4  84:22  84:23
85:3  85:7  85:17
85:10  85:11  85:20
85:21  86:1  86:3
86:17  86:18  86:21
86:23  87:3  88:4
88:5  89:2  89:7
89:9  89:9  89:10
90:18  90:20  91:20
94:22  95:7  97:16
99:19  100:1  100:11
101:22
officer's [2]  52:7
57:1
officers [28]  18:5
20:2  20:9  20:12
23:15  26:2  26:3
27:17  29:2  29:6
30:3  31:12  31:13
34:16  36:15  49:6
58:2  63:20  63:22
73:1  81:3  82:19
83:8  92:15  97:11
97:18  98:13  98:18
old [1]  19:4
once [7] 28:11  47:20
47:21  59:1  74:9
98:3  99:12
one [42] 15:7  28:12
30:11  42:18  45:4
46:12  46:15  49:8
49:13  49:16  50:7
53:15  57:12  62:7
62:12  63:6  63:19
65:5  69:16  71:21
72:15  72:17  73:13
73:15  74:7  74:12
76:8  77:8  77:12
77:13  77:18  78:5
78:12  78:19  82:14
87:14  93:15  94:17
97:14  97:20  100:14
101:3
one-page [1]  96:23
onto [4]  68:1  68:3
68:3  92:7
open [1] 86:20
opened [1]  98:10
operation [2]  38:22
43:6
opinion [2]  58:17
84:18
opposed [1] 101:23
order [1] 99:4  99:13
ordinarily [1]  71:4
71:8  71:20  73:21
ordinary [1]  73:3

75:4    75:6    75:11
76:19   77:4    78:20
78:21   79:21   80:1
82:13   82:20   91:2
96:6    96:22   101:13
101:13  101:16  101:19
102:5
**removing** [1]    49:4
**Renaldo** [1]    90:21
**renewing** [2]    43:18
43:20
**rep** [1]    85:11
**repeat** [1]    57:5
**repeatedly** [4]    59:1
67:2    82:14   82:17
**rephrase** [3]    5:3
71:19   86:6
**replied** [1]    24:10
**report** [1]    100:19
**reports** [3]    43:5
43:10   44:2
**represent** [2]    4:13
85:22
**representation** [1]
85:21
**represented** [4] 85:7
85:8    87:5    87:7
**request** [7]    10:5
11:16   43:17   43:18
43:20   98:11   98:22
**requested** [2]    83:5
85:19
**requesting** [1]    10:3
**requests** [1]    43:22
**reserve** [2]    99:8
99:10
**reserved** [1]    2:19
**resist** [6]    53:20
58:14   61:10   61:11
75:17   75:17
**resisted** [1]    58:10
**resisting** [8]    53:23
54:2    55:10   58:6
58:7    58:9    58:17
60:7
**respective** [1]    2:15
**respond** [3]    6:1
6:4    6:9
**responsible** [1] 46:15
**rest** [1]    87:6
**restaurant** [1]    26:4
29:3
**restrained** [1]    20:10
**retire** [4]    5:13
5:16    8:14    21:5
**retired** [9]    4:9
5:10    10:12   19:10
19:19   28:7    28:10
28:18   39:18
**retirement** [5]    5:19
7:9    12:12   13:1
28:14
**retiring** [4]    6:16
8:17    12:6    20:17
**retrieved** [1]    101:11

**Rezabek** [1]    34:19
**ride** [1]    64:20
**ridiculous** [4]    47:22
95:2    95:3    95:7
**Rieman** [1] 54:20
**right** [7] 48:3    48:17
62:18   66:9    68:19
97:22   99:9
**rights** [4]    6:6
35:6    47:6    99:10
**rival** [2] 22:21   25:14
**ROLAND** [1]    2:2
**role** [2] 45:6    46:2
**roughly** [1]    8:10
8:11    39:13
**route** [3] 47:17   83:11
83:13
**rules** [1] 57:8
**run** [10] 62:12   62:22
63:3    63:23   64:6
64:20   65:12   66:16
75:12   86:15

-S-

**S** [1]    2:21
**Saint** [5] 37:1    37:1
37:2    37:3    37:4
**Salvatore's** [3] 29:2
29:7    29:15
**sat** [2]    13:4    13:9
**saw** [16] 32:19   33:2
33:4    34:17   34:19
45:21   49:12   56:10
92:18   93:4    93:23
94:12   94:15   96:18
96:19   97:2
**scene** [18]    48:23
63:9    63:11   64:17
65:9    73:1    73:5
73:19   74:15   76:9
76:13   76:19   76:21
77:20   79:15   91:4
100:6   100:8
**Schiller** [1]    37:9
**school** [2]    36:22
37:13
**search** [5]    51:2
52:20   53:15   59:20
66:11
**searched** [1]    66:13
**searching** [5]    50:23
52:19   59:5    68:11
68:21
**seat** [8]    13:3    70:20
70:21   101:11   101:14
101:17   101:20   102:8
**second** [5]    55:7
68:20   69:10   72:11
72:18
**secondhand** [1] 46:14
**Secondly** [1]    57:2
**Section** [2]    6:6
35:7
**see** [10]    11:6    26:13
27:12   34:14   49:2

49:11   49:17   92:19
102:2   102:7
**seeing** [2]    41:17
101:23
**seem** [1] 54:20
**sense** [1]    56:17
**separate** [3]    63:13
63:15   63:18
**separately** [1]    80:21
**served** [2]    36:18
38:5
**service** [3]    3:9
3:16    36:22
**sets** [2]    53:16   65:10
**setting** [1]    90:17
**several** [1]    57:6
**severity** [1]    68:5
**shape** [5]    10:17
12:10   12:20   26:23
79:12
**shift** [2] 15:14   15:15
40:21
**shoot** [1]    92:15
**shooting** [7]    41:4
44:6    55:3    55:6
70:9    76:14   97:16
**shootings** [1]    45:3
**shop** [3] 38:6    38:14
39:6
**short** [3] 43:7    86:23
90:23
**short-sleeved-shirt** [1]
41:19
**Shorthand** [1]    103:9
**shorthanded** [1]
73:8
**shortly** [2]    7:9
78:1
**shorts** [1]    79:23
**shot** [12] 41:8    41:11
72:4    72:5    76:17
80:3    92:12   94:18
95:3    95:15   96:2
97:8
**show** [1] 90:7
**showed** [1]    32:4
**sic** [1]    4:13
**side** [18] 37:6    48:9
48:9    48:11   48:17
52:1    52:3    52:5
52:17   68:13   68:14
68:14   68:15   68:22
68:23   69:1    69:3
69:6
**sides** [1] 51:19
**signing** [1]    2:16
**Silmon** [8]    2:8
2:9    4:13    41:2
42:15   51:11   62:10
92:16
**similar** [1]    72:11
**simple** [1]    14:11
**simply** [3]    14:4
58:6    87:3

**sit** [2]    12:8    16:16
**six** [1]    40:23
**slam** [1] 67:21
**sleep** [1] 56:9
**small** [2]    6:6
35:7
**smell** [1]    64:10
**snitching** [1]    26:11
**someone** [10]    16:13
19:22   41:5    41:8
53:10   55:5    55:6
57:17   71:23   94:15
**Sometimes** [1]    92:4
**somewhere** [2]    47:3
91:9
**son** [5]    77:13   77:16
78:6    81:23   82:19
**soon** [1] 8:13
**sorry** [2] 88:19   101:15
**sort** [2] 39:14   53:2
**sound** [2]    47:22
68:18
**source** [3]    82:10
82:23   96:1
**South** [1]    36:11
**speak** [1]    81:12
**speaking** [1]    88:13
**special** [2]    15:13
42:14
**speech** [1]    76:5
**spent** [1]    91:7
**spoke** [4]    82:13
88:8    88:15   89:2
**spoken** [1]    82:12
**SS** [1]    103:2
**Stabler** [3]    24:15
44:18   44:20
**stand** [2]    61:22
67:1    67:3
**standing** [3]    61:23
67:9    68:14
**Stanislaus** [1]    37:4
**start** [2] 38:1    55:5
**started** [3]    39:8
39:9    99:19
**state** [5] 6:6    35:6
75:23   103:1   103:6
**statement** [8]    44:14
45:14   46:13   47:2
47:3    47:9    98:4
98:7
**statements** [13] 45:8
45:16   45:18   45:20
46:5    46:7    46:20
47:1    47:6    84:13
90:11   98:23   99:7
**States** [2]    38:5
38:12
**stating** [1]    13:23
90:14   101:21
**station** [16]    5:22
7:5    64:20   65:1
80:6    80:9    80:12
80:17   83:9    83:10

**sit** [2]    12:8    16:16
83:13   90:4    90:6
90:7    90:12   91:8
**stationhouse** [5]
76:22   76:23   77:21
78:15   79:9
**stay** [6]    39:11   40:5
60:20   67:15   68:1
68:9
**staying** [1]    67:12
76:4
**stealing** [2]    29:12
29:14
**stenographer's** [1]
71:18
**step** [1]  62:21
**still** [7]    19:10   20:16
20:19   37:15   38:22
45:7    97:23
**stipulated** [1]    2:14
**stipulations** [1] 2:12
**stole** [1] 25:6
**stolen** [2]    25:19
29:6
**stood** [4]    18:5
67:11   67:13   67:17
**stopped** [1]    69:14
**store** [1] 36:16
**story** [1] 86:23
**straight** [1]    17:2
**street** [11]    25:13
35:17   35:23   39:5
41:17   41:18   42:1
48:6    48:7    48:9
48:10
**strict** [1] 78:12
**strike** [1]    26:10
37:23   49:15   61:2
73:14   75:15   79:11
79:14   84:21   92:5
92:10   93:10
**subject** [2]    6:5
57:7
**such** [2] 23:20   47:9
**summons** [2]    95:20
95:23
**supervision** [3] 9:16
10:19   10:22
**supervisor** [4]    11:4
19:15   19:20   38:20
**suspect** [5]    59:21
68:20   69:6    72:11
72:19   75:16
**suspects** [23]    46:20
64:23   70:10   70:17
71:2    71:22   72:3
73:5    74:3    74:14
74:19   75:1    75:12
75:15   75:17   76:16
77:1    77:8    78:5
80:3    91:17   92:10
92:12
**suspend** [1]    21:16
**suspended** [7]    20:23
21:7    21:11   21:14
21:21   21:23   22:4
**suspension** [1] 22:7

yet [2]    43:20    66:16
York [7] 2:3    2:6
2:23    6:5    35:6
103:1    103:6
young [9]    11:6
17:8    24:4    40:4
40:5    42:4    43:2
44:3    94:18
Young's [1]    24:3
yourself [3]    24:23
48:19    73:10